Brian ISAACSON, Appellee,

v.

PENN COMMUNITY SERVICES, INC.,
Appellant.

Brian ISAACSON, Appellant,

v.

PENN COMMUNITY SERVICES, INC.,
Appellee.

Nos. 15413, 15414.

United States Court of Appeals,
Fourth Circuit.

Argued Aug. 24, 1971.

Decided Nov. 12, 1971.

James L. Felder, Columbia, S. C., and Charles E. Washington, Jr., Beaufort, S. C. (Broadwater, Cureton & Felder, Columbia, S. C., on the brief), for appellant in No. 15,413, and appellee in No. 15,414.

Willis Fuller, Jr., Darlington, S. C., and Samuel H. Altman, Charleston Heights, S. C. (Padgett, Altman & Fuller, Charleston Heights, S. C., on the brief), for appellee in No. 15,413, and appellant in No. 15,414.

Before HAYNSWORTH, Chief Judge, and WINTER and RUSSELL, Circuit Judges.

WINTER, Circuit Judge:

Plaintiff, whose local draft board classified him as a conscientious objector, performed civilian work of national importance in lieu of induction into the armed forces by becoming a training assistant of defendant, Penn Community Services, Inc., an eleemosynary corporation sponsoring adult education programs and rendering services in a rural community of South Carolina. After

his selective service local board effected his release, he sued under the Fair Labor Standards Act claiming that during the time that he was performing civilian work of national importance he was paid less than the minimum wage and not paid overtime, both as prescribed by the Act. The district judge awarded him judgment for the difference between the amounts paid and the applicable minimum wage, for unpaid overtime and for attorneys' fees—a total judgment of $7,786.14. Defendant appeals, contending that it owes plaintiff nothing, and plaintiff appeals, contending that he was entitled to double his award, less attorneys' fees, as liquidated damages. We conclude that, under the particular circumstances of this case, plaintiff was not covered by the Fair Labor Standards Act and, hence, we reverse and direct that judgment be entered for defendant.

## I

Penn Community is organized under the laws of South Carolina and carries on its activities within that state. Together with its predecessor, Penn School, which was one of the first schools for Negroes in the South, Penn Community has operated on a non-profit charitable basis since 1862. Currently, Penn Community promotes educational, health and community projects through the sponsorship of workshops and seminars; and it offers facilities for interracial conferences with accommodations for as many as 110 guests. Income to carry on its functions is derived from private gifts, institutional and foundation grants, rental of its facilities to the public at large, and rental of its facilities to the government for Peace Corps trainees.

At an undisclosed date prior to the time that plaintiff was classified as a conscientious objector, Penn Community concluded to expand its activities and to create positions to be filled *only by qualified unmarried persons performing alternative service as conscientious objectors.* As described by its Executive Director who was also a member of its Board of Trustees, Penn Community created various positions for "volunteers" who were in the conscientious objector category. Penn Community distributed recruitment circulars for the various new positions which it concluded to create and, after plaintiff had been classified by his draft board as a conscientious objector, he saw the circular for the position of training assistant. Plaintiff made application to Penn Community to fill the position. After interview, plaintiff was appointed, subject to the approval of his local draft board. The approval was forthcoming and plaintiff began his duties on September 14, 1967, and remained in the position until October 19, 1969—a period of approximately thirty days more than his obligation to perform work of national importance for twenty-four months.

The circular advertising the position plaintiff obtained specified that it was to be filled by an unmarried person performing alternative service as a conscientious objector. The job description set forth the duties of the position: taking materials to trainees in the field, purchasing and keeping a stock of supplies, maintaining equipment, elementary servicing of vehicles, meeting visitors at the airport and taking them around to visit projects in the field, and possibly performance of some general office work, all under the direction of the training director. An applicant was advised that the position would involve work on some week-ends and evenings but compensatory time off would be allowed during the week. The circular stated: "A subsistence salary of $100.00 a month is offered, room and utilities provided, together with hospitalization insurance and a three-week vacation annually. Traveling to and from Penn at the beginning and end of the period will be provided. Board is provided during conferences."

Plaintiff was actually paid $108.34 per month beginning on September 14, 1967. This sum was increased to $150.00 per month on April 30, 1968, and again increased to $183.00 per

month on July 31, 1968. Beginning September 14, 1969, when his two-year obligation to perform work of national importance had been fulfilled, plaintiff was paid $2.00 per hour for his services. At the time that plaintiff began his duties the minimum wage was $1.40 per hour, and this was increased to $1.60 per hour after February 1, 1968. At the trial plaintiff testified generally that he had worked overtime in excess of his normal working hours, which were from 8:30 A.M. to 5:00 P.M., and that he averaged working about twenty hours overtime per week. Defendant was unable to show what hours plaintiff had worked or how many hours he had been allowed for compensatory time.

## II

■ With certain specifically designated exceptions, none of which is claimed to be applicable here, the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., fixes minimum wages and requires overtime compensation to be paid by an employer to an employee. An "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee" with certain exceptions not applicable here; "employee" is defined to include "any individual employed by an employer;" and " '[e]mploy' includes to suffer or to permit to work." 29 U.S.C.A. § 203(d), (e) and (g).

The scope of the definitions of "employer," "employee" and "employ" is so broad that one might well conclude, as did the district judge, that plaintiff was an employee of Penn Community. But the teaching of Walling v. Portland Terminal Co., 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947), and the administrative interpretation placed upon the Act by the Wage-Hour Administrator lead us to conclude otherwise on the facts of this case.

*Portland Terminal* concerned yard brakemen trainees during the period of their training. The trainees, who were required to undergo a successful period of training in order to be eligible for employment as brakemen, were first obliged to observe a railroad yard brakemen crew at work. After learning by observation, a trainee was gradually permitted to do actual work under close scrutiny. Regular employees were not displaced because they were required to supervise work performed by the trainees. The trainees did not expedite the railroad's business but in some cases actually impeded and retarded it. If a trainee successfully completed his course of instruction, he was paid $4.00 per day for his training period, and he was either hired as a regular employee or his name placed upon a list of eligibles from which future regular employees would be selected.

Notwithstanding its recognition that *if literally applied* the definitions of "employ" and "employee" were sufficiently broad to render the Act applicable to these trainees, as well as all students of schools or colleges that they attended, the Court said:

> they ["employ" and "employee"] cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction. Had these trainees taken courses in railroading in a public or private vocational school, wholly disassociated from the railroad, it could not reasonably be suggested that they were employees of the school within the meaning of the Act. Nor could they, in that situation, have been considered as employees of the railroad merely because the school's graduates would constitute a labor pool from which the railroad could later draw its employees. * * *

> Accepting the unchallenged findings here that the railroads receive no "immediate advantage" from any work done by the trainees, we hold that they are not employees within the Act's meaning. 330 U.S. at 152–153, 67 S.Ct. at 641.

It should be stressed that these statements were made in a case in which the

trainees received compensation upon successful completion of their training at approximately the same rate that plaintiff received subsistence during the time that he was a training assistant with Penn Community.

Particularly in the case of eleemosynary corporations such as hospitals, museums and schools, the role of the volunteer is not unknown. The volunteer nurse's aid, the person who mans a canteen or sales booth without compensation, the parent who donates services for an entertainment or fund-raising activity are familiar figures in everyday life. And sometimes such persons are provided a meal or reimbursement of transportation expenses or other benefit other than fixed compensation for services. In such cases the Wage-Hour Administrator has deemed such persons not employees covered by the Act, despite the fact that no single exemption contained in the Act excludes them. See, e. g., Opinion Letter No. 927, CCH W–H Admin.Rul. Nov. 1966–March 1969 ¶ 30,-939 (May 29, 1968); see also, Opinion Letter No. 249, CCH W–H Admin. Rul. Aug. 1961–Nov. 1966 ¶ 30,843 (April 30, 1964) where, in an obvious but unspecified reference to *Portland Terminal,* the Wage-Hour Administrator approved voluntary work, by an alien lacking employment visa who wished to learn a manufacturing process, without application of the Act * and Opinion Letter No. 626, CCH W–H Admin.Rul. Nov. 1966–Mar. 1969 ¶ 30,616 (June 28, 1967) for the same general interpretation of *Portland Terminal* in the case of volunteer patient workers.

There is thus ample support for the general proposition that the Act does not apply to every instance in which one suffers or is permitted to work notwithstanding that facially it would appear applicable.

## III

There are some striking analogies between the facts in *Portland Terminal* and the instant case. Plaintiff here and the trainees in *Portland Terminal* both received some compensation—denominated "subsistence" here and an "allowance" in *Portland Terminal*—but less than the minima required by the Act. Both were undergoing a period of training under the supervision of a regular, permanent employee, although the training period in *Portland Terminal* was far shorter than the training period here. Here, the period of training was undoubtedly shorter than the entire twenty-four months, but during the entire twenty-four months plaintiff was subject to supervision. In both cases successful completion of the training period led to the payment of compensation and ultimately to a better paying permanent position.

The rationale of *Portland Terminal* would seem to be that the railroad received no "immediate advantage" from the trainees' services. To state it otherwise, the principal purpose of the seemingly employment relationship was to benefit the person in the employee status. We think that rationale is served here. While we cannot say that Penn Community received no benefit from plaintiff's services, we first note that Penn Community is of far different character from the railroad in *Portland Terminal.* Penn Community is a nonprofit corporation and its corporate purposes are the public good in the community in which it operates. In the broad sense, therefore, any benefit to Penn Community was benefit to the public at

* In this opinion letter, the Administrator stated some of the standards generally applicable to a determination of whether the Act applies, viz: Whether the training is for the benefit of the trainee, whether he displaces regular employees and works under their close supervision and whether the employer derives any immediate advantage by his presence. Of course, these standards were stated with reference to trainees and we do not think that plaintiff was a trainee for all of his twenty-four months of service. But we do not think these standards inapplicable to the question presented by the instant case, and, as we will show, application of each leads to the conclusion that plaintiff was not under the Act.

large—a benefit of a different nature than that of a for-profit enterprise. Particularly is this true because the undisputed evidence is that Penn Community created the position occupied by plaintiff to accommodate plaintiff and others similarly classified as conscientious objectors.

More importantly, we think that the principal benefit of the relationship was to plaintiff in providing him with the opportunity to perform work of national importance to his liking. Plaintiff was recognized to be a conscientious objector. Under the Selective Service Act, 50 U.S.C.A. App. § 456(j), plaintiff was required to "be ordered by his local board, subject to such regulations as the President may prescribe, to perform for a period * * * [of twenty-four months] * * *. such civilian work contributing to the maintenance of the national health, safety, or interest as the local board pursuant to Presidential regulations may deem appropriate * * *." Under the Regulations adopted thereunder, 32 C.F.R. § 1660.1 et seq., plaintiff was permitted to volunteer for appropriate civilian work (§ 1660.10) which he did, or he was permitted to suggest three types of civilian work which he was qualified to do, one of which the board would order him to perform (§ 1660.20(a)), or the board could make the selection, and absent agreement by the plaintiff as to which he would accept, could order him to perform work chosen by the board (§ 1660.20(b)–(d)). It is apparent, therefore, that plaintiff elected to fill a position with Penn Community in satisfaction of his statutory obligation to render service under the Selective Service Act in lieu of volunteering for or induction into the military. While Congress, of course, provides pay and other benefits and allowances for military personnel, it has appropriated no compensation for conscientious objectors performing work of national importance. Nothing in the Regulations requires that conscientious objectors be compensated by those who "suffer or permit" them to perform work of national importance except that travel, meal and lodging allowances are provided for travel to and from the place of performing work of national importance at the beginning and end of the period of national service when a conscientious objector is ordered to perform work in a community other than the one in which he resides. 32 C.F.R. § 1660.21.

From the statutory and regulatory scheme outlined above, we see little to distinguish plaintiff from the trainees in *Portland Terminal* or the volunteer worker in the hospital, museum or school to whom the Act has been held or treated as not applicable. Indeed, because of the uncontradicted evidence that Penn Community created positions, including that filled by plaintiff, to accommodate conscientious objectors, there is a more cogent reason to say that plaintiff is not covered by the Act. This is so because in the case of certain hospital, museum and school volunteer workers we may assume that if voluntary services were not forthcoming, they would have to be purchased in the market place in order to continue the full program of the organization. Plaintiff, however, cannot be said to have displaced a bona fide applicant who desired to sell his services at prevailing rates, or, by reason of the special circumstances which led him to Penn Community, to be an exploited unorganized laborer, evils which the Act was designed to prevent. Missel v. Overnight Motor Transp. Co., 126 F.2d 98, 103–104 (4 Cir. 1942), aff'd, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682 (1942).

IV

We are fully aware that the Wage-Hour Administrator has issued an opinion seemingly contrary to our views. In Opinion Letter No. 687, CCH W–H Admin.Rul. Nov. 1966–Mar. 1969 ¶ 30,681 (November 7, 1967) the Administrator expressed the view:

[A]ny individuals including conscientious objectors, who do, in fact, volun-

teer their services for six months without contemplation of pay would not be considered as employees where there is a bona fide volunteering of their services.

In situations though where the understanding is that the individual will work for wages, there would be an employment relationship, in which case the cash wage together with the reasonable cost of board, lodging, or other facilities should equal at least the minimum wage under the law for the time worked.

The opinion was rendered with respect to nursing home employees. While the nature of the nursing home was not described, i. e., non-profit or otherwise, we will assume the former since 32 C.F.R. § 1660.1 restricts service of national importance by conscientious objectors to employment by governmental units and non-profit organizations engaged in charitable activity for the benefit of the general public.

Although we recognize the deference to which the administrative interpretation is entitled, as well as its presumptive correctness, we are constrained to disagree that the opinion letter, *if applied literally*, correctly states the rule to be applied here. When read in its entirety, the opinion letter seems to proceed by the mechanical route that since there is no specific exemption for conscientious objectors from the Act's broad coverage, the Act must apply to them. But *Portland Terminal* teaches that this is not invariably so, as do the Wage-Hour Administrator's other rulings, including the instant opinion letter. In any event, the Fair Labor Standards Act must be applied with due regard to Congress' enactment of the Selective Service Act which creates an obligation to serve, but which, as well as the regulations promulgated thereunder, fails to require the payment of any compensation, let alone subsistence, except for reporting to and returning from work of national importance, in the fulfillment of the duty to serve.

But the opinion letter need not be construed as in conflict with the result we reach. The Administrator's use of "contemplation of pay" and "wages" can be construed to mean only that payment above some ascertainable subsistence level must equal the minimum wage. While the Administrator has not defined at what level "subsistence" becomes "pay" or "wages," the Administrator has repeatedly demonstrated full appreciation of *Portland Terminal,* where a payment of $4.00 per day—the approximate amount received by plaintiff here —was made, and it was held that the Act did not apply. Because plaintiff's "subsistence salary," even including his lodging, board while conferences were held, and other benefits, would not, by today's standards, seem to exceed the $4.00 per day in *Portland Terminal,* by the standards of that day, we conclude that the Administrator would permit the payment of some subsistence without insisting that an employment relationship covered by the Act has been created and that plaintiff's subsistence exceeded permissible limits for non-coverage.

This is not to say that, as a general proposition, we would countenance conscientious objectors being treated as a labor pool available for work of national importance at substandard wages or unreasonably long, uncompensated for, working hours. But here, where a special position was created to provide plaintiff with a means of performing work of national importance, where plaintiff did not displace another member of the general labor market, and where plaintiff voluntarily entered upon his work of national importance in fulfillment of his obligation to serve with full knowledge of the limited subsistence to be provided him, we cannot conclude that he has a right to judgment under the Act.

Reversed.