Ann McLAUGHLIN, Secretary of Labor, United States Department of Labor, Plaintiff–Appellant,

v.

Kirby G. ENSLEY, Defendant–Appellee.

No. 88–1734.

United States Court of Appeals, Fourth Circuit.

Argued March 9, 1989.

Decided June 20, 1989.

Ford Friel Newman (George R. Salem, Sol. of Labor, Greenville, S.C., Monica Gallagher, Associate Sol., Linda Jan S. Pack, Washington, D.C., Counsel for Appellate Litigation, Bobbye D. Spears, Regional Sol., Atlanta, Ga., on brief), for plaintiff-appellant.

Fred Henry Moody, Jr. (McKeever, Edwards, Davis & Hays, P.A., Bryson City, N.C., on brief), for defendant-appellee.

Before CHAPMAN and WILKINS, Circuit Judges, and WILLIAMS, District Judge for the Eastern District of Virginia, sitting by designation.

**1208**

CHAPMAN, Circuit Judge:

This case involves the meaning of "employee" as it applies to rights under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (1982). More precisely, the issue is whether certain workers, who performed duties for an employer during a weeklong orientation period, were employees for purposes of the Fair Labor Standards Act's minimum wage and overtime provisions. Because we believe these workers should have been considered employees, we reverse.

## I

The defendant in this action, Kirby Ensley, is the proprietor of a snack foods distribution business in Sylva, North Carolina. At the time of the events relative to this action, Ensley employed route men to drive his company trucks, to restock vending machines, and to sell "potato chips, candy, crackers, and peanuts" on a commission basis to retailers. The employees' income derived entirely from commission sales. They generally worked Monday through Friday, and sometimes on Saturday, for a total of about 50 to 60 hours per week.

Before hiring persons for route jobs, Ensley required them to participate in what was usually five days of exposure to the tasks they would be expected to perform. The parties agree that Ensley did not pay any form of compensation to the potential routemen during this week. During the week, which included about 50–60 hours of labor, the potential routeman traveled an ordinary route with an experienced routeman. They loaded and unloaded the delivery truck, restocked stores with Ensleys' product, were given instruction on how to drive the trucks, were introduced to retailers, were taught basic snack food vending machine maintenance, and occasionally helped in preparing orders of goods and with financial exchanges.

At trial, conflicting evidence was introduced as to whether Ensley's business benefited from the new workers' activities. Ensley himself claimed that the trainees may have hindered normal operations. The testimony of two experienced drivers was that the extra hands naturally made their work load lighter. Similarly, there was disagreement as to the extent to which formal hiring was contingent on completion of the program. Ensley maintained that the training did not guarantee a future job. Yet there was evidence that no person, who had completed the training, was not subsequently hired.

After the government presented its case against Ensley to the jury, the defendant moved for a directed verdict, which, on the issue now before this court, was granted by the district court. Relying particularly on *Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947), *Donovan v. American Airlines, Inc.*, 686 F.2d 267 (5th Cir.1982), and *Isaacson v. Penn Community Services, Inc.*, 450 F.2d 1306 (4th Cir.1971), the court concluded that the determination of whether one is an employee for purposes of the Act is a legal question not reserved to the jury. After discussing generally the propositions that work under close scrutiny, work which does not displace other employees, and work which does not expedite a company's business are factors which help reveal whether a worker is an employee for purposes of the Act, the court determined that in light of plaintiff's evidence, the routemen in training were not employees. The court then proceeded to consider how the six-part test, developed by the Wage and Hour Division to aid in its own determinations of when a so-called trainee is really an employee, should be applied in this case.[1]

---

**1.** The six criteria, all of which must be met before Wage and Hour determines there is no employment relationship, are: (1) the training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school, (2) the training is for the benefit of the trainees, (3) the trainees do not displace regular employees, but work under close observation, (4) the employer that provides the training derives no immediate advantage from the activities of the trainees and on occasion his operations may actually be impeded, (5) the trainees are not necessarily entitled to a job at the completion of the training period, and, (6) the employer and the trainees understand that the trainees are not

The court believed that the instruction provided by Ensley was similar to that given in a vocational school for outside salesmen, that the training was for the benefit of the students, that the trainees did not displace regular workers, that Ensley derived no immediate advantage from the activities of the trainees, that the trainees were not necessarily entitled to a job, and that both parties understood that the new workers were not to receive wages.

## II

The starting point for an analysis of the question posed are the companion cases of *Portland Terminal, supra,* and *Walling v. Nashville, Chattanooga and St. Louis Ry.,* 330 U.S. 158, 67 S.Ct. 644, 91 L.Ed. 816 (1947). There, the Supreme Court addressed at some length the relationship between training that is not covered by the Act and employment that invokes its protection. The Court considered that "[w]ithout doubt the Act covers trainees, beginners, apprentices, or learners if they are employed to work for an employer for compensation." More accurately, however, the issue is whether such trainees are "employed," and the Act defines employ as "to suffer or permit to work." Despite the broadness of this definition, the Court believed that it "obviously" excluded those without a promise of compensation who worked for their own advantage on another's property, and did not "make a person whose work serves only his own interest an employee of another person who gives him aid and instruction." Similarly, the Act was not intended to penalize employers for instruction that will "greatly benefit" the trainees. Finally, it would be important to consider whether an employer received any work of "immediate advantage" from the employee. *Portland Terminal,* 330 U.S. at 151–53, 67 S.Ct. at 640–42.

This court has not had many opportunities to consider *Portland Terminal.* Although it has applied the case from an early date, *see McComb v. Homeworkers'*

*Handicraft Cooperative,* 176 F.2d 633, 639 (4th Cir.1949) (stating that *Portland Terminal* "merely held that learners or apprentices taking a training course under an agreement that compensation should not be paid them were not to be deemed employees within the meaning of the act."), and *Walling v. Norfolk Southern Ry. Co.,* 162 F.2d 95, 96 (4th Cir.1947) applying the holding of *Portland Terminal* to a factually identical case), it was not until *Wirtz v. Wardlaw,* 339 F.2d 785 (4th Cir.1964), and *Penn Community Services, supra,* that this court offered a broad discussion of the issue.

■ In *Wardlaw,* which involved the hiring by an insurance salesman of two women at less than minimum wages, the court held that the women were entitled to minimum wages and overtime compensation. Distinguishing the case from *Portland Terminal,* the court found it determinative that the employer's interests were served by the women's work and that he "benefited from their labors." *Wardlaw,* 339 F.2d at 788. In *Penn Community Services,* the court held that *Portland Terminal* had established that when "the employer received no 'immediate advantage' from the trainees' services," that is, when "the principal purpose of the seemingly employment relationship was to benefit the person in the employee status," the worker could not be brought under the Act. *Penn Community Services,* 450 F.2d at 1308. In sum, this court has concluded that the general test used to determine if an employee is entitled to the protections of the Act is whether the employee or the employer is the primary beneficiary of the trainees' labor.

## III

■ As a result, the proper legal inquiry in this case is whether Ensley or the new workers principally benefited from the weeklong orientation arrangement.[2] There

---

entitled to wages for the time spent in training. Wage and Hour Manual (BNA) 91:416 (1975).

**2.** We do not rely on the formal six-part test issued by the Wage and Hour Division. Instead, because of the clear precedent of *Wardlaw* and *Penn Community Services,* we believe proper

are several facts that serve to illustrate the relative degrees of benefit. The most important of these relate directly to the nature of the training experience. The evidence established that the workers drove trucks, loaded and unloaded trucks, restocked retail store shelves and vending machines, learned basic food vending machine maintenance, and performed simple kinds of paperwork.

This recitation of the weeks' events establishes the very limited and narrow kinds of learning that took place, and requires a conclusion that the district court misapplied the controlling legal principle to the facts in evidence by granting the directed verdict. The prospective employees were simply helping to service a route, and the instruction they received did not rise to the level that one would receive in a general, vocational course in "outside salesmanship." The trainees were taught only simple specific job functions related to Ensley's own business.

By applying these factual circumstances to the legal question of which party received the principal benefit, it becomes plain that Ensley received more advantage than the workers. Ensley, without cost to himself, obtained employees able to perform at a higher level when they began to receive pay. Ensley also received a free opportunity to review job performance, and he received the benefit of aid to his regular employees while they performed their normal duties. These new workers were, in fact, helping Ensley to distribute his snack foods. On the other hand, it is clear that the workers received very little. As noted above, the skills learned were either so specific to the job or so general to be of practically no transferable usefulness. The brevity of the training period helps to underscore this fact. Finally, there was no credible evidence that a person who completed the training was not subsequently hired, suggesting that the new workers should be considered at-will employees from the beginning.

For the above reasons we conclude that those persons, who participated in the or-

analysis derives from the principles stated in

ientation program and are properly identified as such, are entitled to be considered as covered employees under the Fair Labor Standards Act and to receive minimum wages for one week of work. Accordingly, we reverse the judgment of the district court.

WILKINS, Circuit Judge, dissenting:

The majority characterizes the "proper legal inquiry [as] whether Ensley or the new workers principally benefited from the weeklong orientation arrangement." However, the true legal issue is whether the trainees were "employees" within the definition of 29 U.S.C.A. §§ 203(e)(1), 203(g) (West 1978 & Supp.1989). The district court, in concluding that Ensley's trainees were not employees, applied the correct legal test and based its holding on factual findings that are not clearly erroneous. I would therefore affirm.

I.

The term "employee" is defined in the Fair Labor Standards Act as "any individual employed by an employer." 29 U.S.C.A. § 203(e)(1). The term " '[e]mploy' includes to suffer or permit to work." 29 U.S.C.A. § 203(g). While the Act neither defines "trainees" nor specifically provides that trainees are not employees for minimum wage purposes, the Supreme Court in *Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947), held that trainees are not employees under the Act during their training period.

In *Portland Terminal* the training period for railroad brakemen was seven to eight days and was conducted by regular yard crew employees on actual rail lines. The trainees learned first by observation and then by doing "actual work under close scrutiny." *Id.* at 149, 67 S.Ct. 640. The trainees did not displace any regular employees while working because the regular employees were required to closely supervise the trainees. The trainees' work did not "expedite the company business, but

those cases.

... sometimes ... actually impede[d]" it. *Id.* at 150, 67 S.Ct. at 640. Thus the railroads "receive[d] no 'immediate advantage' from any work done by the trainees." *Id.* at 153, 67 S.Ct. at 642. Trainees who successfully completed the training were eligible to be hired, and those not immediately hired were contacted when positions became available. There was no evidence regarding whether the railroad paid, or the trainees expected, any wages for the training period beyond a $4.00 per day allowance. On these unchallenged facts the Court held that the trainees did not fall within the legal category of "employee" during their training period.

Following *Portland Terminal* the Wage and Hour Division of the Department of Labor promulgated a six-part test to guide its determination of whether trainees are in fact employees. The six enumerated factors in the Wage and Hour test are whether:

(1) the training, even though it includes actual operation of the facilities of the employer, is similar to that which would be given in a vocational school;

(2) the training is for the benefit of the trainees;

(3) the trainees do not displace regular employees, but work under close observation;

(4) the employer that provides the training derives no immediate advantage from the activities of the trainees and on occasion his operations may actually be impeded;

(5) the trainees are not necessarily entitled to a job at the completion of the training period; and,

(6) the employer and the trainees understand that the trainees are not entitled to wages for the time spent in training.

*Donovan v. American Airlines, Inc.,* 686 F.2d 267, 273 n. 7 (5th Cir.1982). *See* Wage & Hour Manual (BNA) 91:416 (1975). These factors are not exhaustive and are intended to be consistent with *Portland Terminal* and the companion case of *Wall-*

*ing v. Nashville, Chattanooga & St. Louis Ry.,* 330 U.S. 158, 67 S.Ct. 644, 91 L.Ed. 816 (1947). Wage & Hour Opinion WH–229 (June 29, 1973), *reprinted in* Wage & Hour Manual (BNA) 91:451–52 (1975).

Under both *Portland Terminal* and the Wage and Hour six-part test, the findings a court must make before reaching the legal question of whether trainees are employees are virtually identical. Neither approach relies exclusively on a single factor, but instead requires consideration of all the circumstances. The Wage and Hour test is therefore a reasonable application of the Fair Labor Standards Act and *Portland Terminal* and entitled to deference by this court. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

## II.

Addressing the legal issue of whether trainees are employees during a training period, the *Donovan* court stated:

The standard of review of the district court's decision is that of a legal, and not a factual, determination. Thus, although we are bound by the clearly erroneous standard in reviewing the individual findings of fact leading to the district court's conclusions, we review the determination that the [trainees] were not employees as we review any determination of law.

686 F.2d at 270 n. 4. *See Patel v. Wargo,* 803 F.2d 632, 634 (11th Cir.1986); *Beliz v. W. H. McLeod & Sons Packing Co.,* 765 F.2d 1317, 1327 (5th Cir.1985). In *Donovan* the court affirmed a district court resolution of the ultimate legal question that airline flight attendant trainees were not employees during their training period. 686 F.2d at 271. Before reaching the legal issue, the court reviewed, among other factors, the district court analysis of "the 'relative benefits flowing to trainee and company during the training period,'" *id.* at 271, and concluded that "the district court's finding that trainees gain the great-

er benefit from their experience is fully supported by the evidence." *Id.* at 272.

### III.

The district court based its conclusion that Ensley's trainees were not employees on findings of fact covering all the factors considered in *Portland Terminal* and all six parts of the Wage and Hour test. Regarding Ensley's training program, the district court found the following facts:

(1) [i]t could be training that they could get in schools [and] would be fine training for any outside salesman;

(2) all of it was for the benefit of the trainee or the student, that the employer received no benefits directly from it;

(3) [the trainees] didn't replace any employee ... [b]ut worked under [the] close observation of the other employees;

(4) [Ensley] derives no immediate advantage from the activities of the trainees or students and on occasion the operations may actually be impeded;

(5) [the trainees, at the end of training,] wouldn't necessarily have a job. If they liked it and it turned out, they would get a job but if they didn't they wouldn't; [and]

(6) [e]very single one of [the trainees] said they were told they were not entitled to wages [during the training].

All of these factual findings are fully supported by evidence in the record, and are not clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–76, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d, 518 (1985). And since "the facts found by the District Court ... permitted the District Court's legal conclusion," *Amadeo v. Zant*, 486 U.S. 214, ——, 108 S.Ct. 1771, 1776, 100 L.Ed.2d 249, 260 (1988), the district court judgment should be affirmed.

Rather than determining whether any of the district court factual findings are clearly erroneous before reaching the legal is-sue of whether the trainees were employees, the majority opinion focuses its inquiry on one of the underlying factors and recharacterizes it as the "proper legal inquiry" in the case. The determination of whether Ensley or the trainees principally benefited from the training program is but one factor to be considered in determining the legal question of whether Ensley's trainees were employees.

The majority's characterization of the training accomplished during the week ignores those attributes upon which the district court based its findings. While the trainees no doubt carried boxes and helped to load and unload trucks, the evidence presented supports the district court's findings that the trainees learned job-related skills, fundamental skills necessary to successfully perform the job of routeman in Ensley's company. In addition to vending machine maintenance and truck driving, the evidence shows that the trainees generally learned how to interact with store managers,[3] complete some of the paperwork necessary to process orders, read and understand a routebook, handle money and address credit and billing problems, and comply with Ensley's warehouse and delivery truck inventory control procedures. After the training period was over and employment began, a new routeman was taught other more technical job skills.

The majority minimizes the importance of the skills taught during the training period, finding that the trainees learned to perform only "basic" vending machine maintenance and "simple kinds" of paperwork, and cites the brevity of the five-day training period as support for its finding that no meaningful training occurred. The average training period in *Portland Terminal* spanned a comparable seven or eight days. The fact that Ensley required only five days of training in the basic skills necessary to begin this job underscores the reasonableness of the training period. *See*

---

**3.** The trainees did not necessarily take over the route on which they trained, so while meeting the store managers may be considered mere orientation, learning how to interact with a manager was the relevant skill taught.

*Tony & Susan Alamo Found. v. Secretary of Labor,* 471 U.S. 290, 301, 105 S.Ct. 1953, 1961, 85 L.Ed.2d 278 (1985).

The majority emphasizes that the skills taught were specific to Ensley's operation or otherwise too general, either extreme producing "practically no transferable usefulness." This factor is of little significance. In *Donovan,* the district court found that American Airlines taught its trainees the skills necessary to perform jobs in its organization, and required applicants to complete the training regardless of prior experience in the airline industry. While some of the skills taught were no doubt transferable, American intended to teach its trainees "American's, and only American's," internal procedures, practices, grooming requirements, and " 'style.' " 686 F.2d at 269. The court held that while the training was "made more effective and less expensive by ... devoting it entirely to American's policies, [this did not] mean that trainees [were] working while receiving this instruction." *Id.* at 272. It makes no difference that Ensley chose not to teach more generally useful skills and that Ensley's program was "without cost to himself."

The majority alludes that Ensley "received the benefit of aid to his regular employees," but it fails to identify this alleged benefit. Since the snacks were sold from store shelves and vending machines, extra hands would not create any net increase in actual sales. There is no allegation that Ensley was able to reduce the number of trucks necessary to serve the area by requiring trainees to assist the drivers, so Ensley's delivery costs were in no way reduced. And since the drivers worked on a commission-based compensation plan and made deliveries to a set number of locations each day, any reduction in a driver's delivery time would not reduce Ensley's compensation costs to the routeman. In short, the district court did not clearly err in finding that Ensley received no immediate financial benefit from any assistance the trainees might have given to the supervising routemen during the training period.

Ensley did, of course, "benefit" from the training in that he was able to hire, at the end of the training period, a new routeman who was minimally qualified for the job. This "benefit," however, is present in every training-period case. For example, in *Donovan* the court held that "[a]lthough training benefits American by providing it with suitable personnel, the trainees attend [the training] for their own benefit, to qualify for employment they could not otherwise obtain." 686 F.2d at 272. Thus the training of prospective employees does not, by itself, constitute an " 'immediate advantage' " to the employer. *Portland Terminal,* 330 U.S. at 153, 67 S.Ct. at 642.

IV.

Finally, the majority's conclusion that Ensley's trainees are employees during the training period contravenes the policies underlying the trainee exclusion from the minimum wage law. The short term result of this contravention of policies produces a windfall to the small number of employees who have already completed Ensley's training program, and who had availed themselves of the training with no expectation of compensation. However, in the long term the majority's decision will tend to make it more difficult for young and/or unskilled persons seeking employment opportunities beyond that of an unskilled laborer to find employment.

Addressing the policies which support the statutory allowance of a sub-minimum wage for trainees, paid pursuant to special certifications issued under 29 U.S.C.A. § 214(1) (West 1965 & Supp.1989), the Supreme Court has said:

Many persons ... have so little experience in particular vocations that they are unable to get and hold jobs at standard wages. Consequently, to impose a minimum wage as to them might deprive them of all opportunity to secure work, thereby defeating one of the Act's pur-

poses, which was to increase opportunities for gainful employment. *Portland Terminal,* 330 U.S. at 151, 67 S.Ct. at 641.

Ensley's trainees knew they would receive no compensation for the five days spent learning the rudiments of the job of routeman. Nonetheless they agreed to the arrangement, no doubt rationally concluding that the week of training was a suitable investment in their own future. Some had second thoughts after a few days of training, for the record shows that some trainees quit before the five days were completed. These individuals undoubtedly concluded that the investment was not worth it for them, most likely because the nature of the job for which they were training was not to their liking.

While Ensley might have chosen to pay his trainees in order to attract more skilled applicants, he opted for applicants who agreed to volunteer for a week of training with no compensation. The applicants volunteered for the training in order to obtain jobs they were seriously considering. As the Fifth Circuit has stated:

> We are aware that many companies hire persons as employees and then pay them while they attend company schools. These employers are governed ... by the demands of the market place [sic] and by their own specialized needs. The FLSA does not require [all employers] to follow this course.

*Donovan,* 686 F.2d at 272.

I respectfully dissent.

