**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1546**

CLAUDIA HARBOURT; MICHAEL LUKOSKI; URSULA POCKNETT,

Plaintiffs - Appellants,

v.

PPE CASINO RESORTS MARYLAND, LLC,

Defendant - Appellee.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Catherine C. Blake, Chief District
Judge.  (1:14-cv-03211-CCB)

Argued:  March 1, 2016                Decided:  April 25, 2016

Before MOTZ, GREGORY, and THACKER, Circuit Judges.

Reversed and remanded by published opinion.  Judge Motz wrote
the opinion, in which Judge Gregory and Judge Thacker joined.

**ARGUED**: Steven Marc Lubar, THE LAW OFFICES OF PETER T. NICHOLL,
Baltimore, Maryland, for Appellants.  Todd James Horn, VENABLE
LLP, Baltimore, Maryland, for Appellee.  **ON BRIEF**: James Anthony
Lanier, THE LAW OFFICES OF PETER T. NICHOLL, Baltimore,
Maryland, for Appellants.   Lillian L. Reynolds, Baltimore,
Maryland, Robert G. Ames, VENABLE LLP, Washington, D.C., for
Appellee.

DIANA GRIBBON MOTZ, Circuit Judge:

The district court dismissed this action, which alleges violations of federal and state employment laws, as failing to state a claim on which relief could be granted. Because the plaintiffs have alleged sufficient facts to state a claim, we must reverse and remand for further proceedings.

I.

The account of the facts set forth here quotes and derives from the allegations in the seventeen-page complaint.

PPE Casino Resorts Maryland, LLC ("the Casino") owns and operates Maryland Live!, a casino in Hanover, Maryland. Beginning in June 2012, in response to the legalization of gambling in Maryland, the Casino began offering slot machines. Pursuant to a November 2012 referendum, the State authorized casinos, beginning on April 11, 2013, to also operate table games like blackjack, poker, craps, and roulette.

The Casino "did not have dealers for the [anticipated] approximately one hundred and fifty (150) live table games" opening at Maryland Live! on April 11. In fact, it needed to hire approximately 830 dealers by April 11 to begin operating the planned table games on that date. Because "different casinos implement different methods concerning how to operate table games," the Casino needed "to develop a training course

2

that would ensure" that new employees "would be equipped to perform duties specific to dealing at Maryland Live!" Thus, the Casino developed "what [it] labeled . . . a free twelve (12) week table games 'dealer school'" to be "held in conjunction with Anne Arundel County Community College." In mid-November 2012, the Casino began advertising employment opportunities for table game dealers. The Casino held information sessions about the jobs and the required "dealer school."

Plaintiffs, Claudia Harbourt, Michael Lukoski, and Ursula Pocknett (collectively "the Trainees"), as well as approximately 10,000 other persons, applied for these advertised positions. The Casino extensively interviewed applicants, assessing their congeniality, personality, and ability to perform basic math on their feet. The Casino asked select applicants, including the Trainees, "if they would like to attend a course to become a dealer at Maryland Live!" and explained that the course would be free, last twelve weeks, and would teach them "how to conduct table games for Maryland Live!"

The Casino selected approximately 830 of the applicants to attend the "dealer school." The "dealer school" consisted of four hours of daily instruction Monday through Friday, offered in four time periods. The "school" was thus scheduled to run for twenty hours per week for twelve weeks, although it consumed more hours because of "numerous delays" caused by Casino staff.

3

The Casino conducted the "school" from January 7, 2013 to April 1, 2013,[1] ending just ten days before the start of legalized table games in Maryland.

The "dealer school" training "was specific to the manner in which" the Casino's employees were "to perform the[] table games at Maryland Live!" Although the Casino advertised the "school" as being held in conjunction with a community college, in fact, it was run completely by the Casino. The Casino authored all course materials, Casino employees provided all instruction, and attendees never interacted with anyone from a community college. During the "school," the attendees completed employment forms, including an income tax withholding form and direct deposit authorization form. To help the attendees receive a gambling license by the end of the course, the Casino required them to submit to a drug test, provide their fingerprints and social security numbers, and authorize the Casino to obtain their driving records and perform criminal and financial background checks on them.

Plaintiff Harbourt attended the "dealer school" for approximately eight weeks; Plaintiff Pocknett attended it for

---

[1] The complaint alleges that the course ended "on April 14, 2013," but a twelve-week course beginning on January 7, 2013 would end by April 1, 2013. Like the district court, we understand the complaint's reference to April 14 to be a typographical error.

4

eleven weeks; and Plaintiff Lukoski attended the "school" for all twelve scheduled weeks and worked as a dealer at the Casino. The Casino did not pay Harbourt or Pocknett at all, but did pay Lukoski and others who attended the "school" for the full twelve weeks the minimum wage, $7.25 per hour, for the final two days of the "dealer school."

In 2014, the Trainees filed this putative class action asserting violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (2012) ("FLSA" or "the Act"), the Maryland Wage and Hour Law, Md. Code, Lab. & Empl. §§ 3-401 to -431 (2015) ("MWHL"), and the Maryland Wage Payment and Collection Law, Md. Code, Lab. & Empl. §§ 3-501 to -509 (2015) ("MWPCL"). The Casino moved to dismiss for failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6). The district court granted the motion to dismiss, holding that the Trainees "fail[ed] to show that the primary beneficiary of their attendance at the training was the Casino rather than themselves." This timely appeal followed.


II.

We review de novo the grant of a motion to dismiss for failure to state a claim. Weidman v. Exxon Mobil Corp., 776 F.3d 214, 219 (4th Cir. 2015). In doing so, we accept as true the well-pled allegations of the complaint and construe the

5

facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Brower v. Cty. of Inyo, 489 U.S. 593, 598 (1989). A plaintiff "must allege sufficient facts to establish th[e] elements" of his claim and "advance [that] claim across the line from conceivable to plausible." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012) (internal quotation marks omitted). However, "a plaintiff need not 'forecast' evidence sufficient to prove" a claim. Id.

The FLSA requires that employers pay employees the minimum hourly wage "for all hours worked." Perez v. Mountaire Farms, Inc., 650 F.3d 350, 363 (4th Cir. 2011) (internal quotation marks omitted). The Act does not define "work." See 29 U.S.C. §§ 201-219. But the Supreme Court has instructed that "in the absence of a contrary legislative expression" we assume that Congress was referring to work or employment "as those words are commonly used -- as meaning physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business." Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 598 (1944), superseded by statute on other grounds, Portal-to-Portal Act of 1947, Pub. L. No. 104-188, 110 Stat. 1928.

The FLSA does define "employee" and "employ," but those definitions do little to advance the inquiry. The statute defines "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and "employ" as "to suffer or permit to work," id. at § 203(g). Courts construe the term "employee" broadly, but recognize that the term "does have its limits." Steelman v. Hirsch, 473 F.3d 124, 128 (4th Cir. 2007) (internal quotation marks omitted).

More than sixty years ago, the Supreme Court made clear that a trainee may be an "employee" for purposes of the FLSA. See Walling v. Portland Terminal Co., 330 U.S. 148, 151 (1947) (noting that "[w]ithout doubt the Act covers trainees"); see also Walling v. Nashville, C. & St. L. Ry., 330 U.S. 158, 159 (1947)(companion case). But, in Portland Terminal, relying on the district court's factual findings, the Court concluded that railroad trainees could not claim the benefits of the Act when the training they received "most greatly benefit[ted] the trainees" rather than the railroad. 330 U.S. at 153. The Supreme Court also noted the district court's unchallenged findings that the railroad "receive[d] no 'immediate advantage'" from the trainees' efforts during training. Id. The Court thus affirmed judgment for the railroad. Id. In doing so, however, the Court expressly noted that the record contained no "findings []or charges" that the training was "conceived or carried out in

7

such a way as to violate either the letter or spirit" of the FLSA and left open the question of whether such "findings or charges" might require a different result.  Id.

Subsequent case law assessing whether a trainee constitutes an "employee" for FLSA purposes is sparse.  The Supreme Court has never again spoken to the issue and we have addressed the question only once.  In McLaughlin v. Ensley, 877 F.2d 1207, 1208, 1210 (4th Cir. 1989), we held that trainee routemen of a food distribution company were "employees" for FLSA purposes when they participated in a five-day, 50-to-60-hour training program in which they learned how to load trucks and maintain food vending machines and helped experienced routemen perform their duties.  Relying on Portland Terminal, we identified the critical legal question as whether the trainee or the company was the "primary beneficiary" of the training program.  Id. at 1209.  Whether the employer received an "immediate advantage" from the training was, we reasoned, also "important to consider," but not dispositive.  Id.  Applying the controlling legal standard to the facts found by the district court, we held that the employer food distribution company "received more advantage" from the program than the trainees and so concluded

that the trainees qualified as employees for purposes of the FLSA.  Id. at 1210.[2]

With these principles in mind, we turn to the case at hand.


                              III.

The Casino maintains that the Trainees' complaint fails because "it is literally impossible for the Trainees to show that they provided the Casino with any work or that the Casino received any benefit during the time they attended table game dealer's school because . . . the Casino did not operate table games at that time."  Appellee's Br. at 14 (emphasis in original).  The fact that table games were not in operation during the training well may prove an insurmountable obstacle to the Trainees' recovery under the FLSA, but that fact does not, as a matter of law, bar them from recovery.

As noted above, "work" for FLSA purposes broadly encompasses "physical or mental exertion (whether burdensome or

---

[2] Our sister circuits have similarly not often grappled with the employee/trainee question.  Indeed, the Casino relies on only three such cases.  In each, the courts affirmed judgments for the employer, but in each the appellate court relied on facts (very different facts from those alleged here) which were established by the summary judgment record or at trial.  See Petroski v. H & R Block Enters., LLC, 750 F.3d 976, 981 (8th Cir. 2014) (affirming grant of summary judgment); Reich v. Parker Fire Prot. Dist., 992 F.2d 1023, 1027–29 (10th Cir. 1993) (same); Donovan v. Am. Airlines, 686 F.2d 267, 271–73 (5th Cir. 1982) (affirming judgment after trial).

not) controlled or required by the employer" primarily for its benefit. Tennessee Coal, 321 U.S. at 598. And "training" can constitute "work" under the statute. See Portland Terminal, 330 U.S. at 151; Ensley, 877 F.2d at 1209; cf. 29 C.F.R. §§ 785.27-.31 (2015) (establishing the requirements that mid-employment training must meet for the training not to count toward work hours). That the Casino could not operate table games during the "dealer school" does not necessarily mean that the Trainees were not working for FLSA purposes in attending the required "school."

The Casino seems to believe that because the Trainees could not interact with paying customers in the Casino during the "school," the Trainees automatically fail to qualify as FLSA employees performing work for the Casino. But the Trainees are in the very same position as all other persons training for positions where they cannot yet perform their duties, either because the service is not yet legal, the person is not yet licensed, or the employer is not yet operating. Inexperienced persons required to train to be waiters in a huge about-to-be-licensed, but not yet open, restaurant, or to train and seek licensure to be hairdressers in an enormous about-to-be-opened, but not yet operating, hair salon franchise would be in precisely the same position as the Trainees here. In each case, whether the required training would constitute work for FLSA

10

purposes would depend on whether it primarily constituted a benefit to the employer or the trainee. And, notwithstanding the Casino's contention to the contrary, resolution of that question cannot be determined by examination of the Trainees' complaint.

For in their complaint, the Trainees allege facts supporting their claim that the Casino, and not the Trainees, primarily benefitted from the training. Specifically, the Trainees allege that the Casino received a very large and immediate benefit -- an entire workforce of over 800 dealers trained to operate table games to the Casino's specifications at the very moment the table games became legal. And the Trainees further allege that, in contrast, they received very little from the twelve weeks of training that did not primarily benefit the Casino. This is so, they allege, because the training was unique to the Casino's specifications and not transferrable to work in other casinos.[3] In Ensley, we specifically recognized the importance of the transferability of the training received when balancing who -- employer or trainee -- benefitted most

_____

[3] The district court held that the plaintiffs' allegation that the course had no transferable usefulness was not plausible because Maryland's regulation of table games is "extraordinarily detailed, leaving little room for casino-specific duties." The regulations are numerous but do not, as a matter of law, foreclose a plausible finding that the bulk of the training was Casino-specific and thus non-transferrable.

11

from the training.  See 877 F.2d at 1210.  Our sister circuits, in the very cases on which the Casino relies, have similarly recognized the importance of this factor in determining the primary beneficiary.  See Petroski, 750 F.3d at 981; Parker Fire, 992 F.2d at 1027-29; Am. Airlines, 686 F.2d at 271-73.  And those courts relied on facts established by the summary judgment record or at trial to resolve this question.  Id.

Moreover, unlike in Portland Terminal, here there are "charges" that the training was "either conceived or carried out in such a way as to violate . . . the spirit of the minimum wage law."  330 U.S. at 153.  The Trainees allege that the "sole purpose" of the Casino's "temporary makeshift 'school' was to hire the exact number of dealers needed to fill the vacant table games positions."  They further allege that the Casino "disguised its employee-training course as a school for the purpose of not paying" the trainees.  If true, a fact finder could conclude that requiring applicants to attend a training "school" for twenty hours each week for a full twelve weeks, training advertised to be associated with a community college course but that allegedly had nothing to do with any college, demonstrates that the Casino "conceived or carried out" its "school" to avoid paying the minimum wage.  Id.  A fact finder could further conclude that an employer would only take such actions to avoid paying the minimum wage to persons who were

12

labelled "trainees" but who actually worked for the Casino and were FLSA employees.[4]

Finally, the Trainees allege, and the Casino acknowledges, that the Casino paid all participants in the "dealer school" the minimum hourly wage for the last two days of the twelve weeks of training. This certainly suggests that the Casino regarded the participants in the "dealer school" as employees doing work for the Casino for those two days. Of course, it may be that it was only during those two days that the trainees performed "physical or mental exertion" that was "pursued necessarily and primarily for the benefit of the employer and his business." Tennessee Coal, 321 U.S. at 598. But the record before us supplies no basis for such a conclusion. Rather, at present it is unclear what distinguishes those two days from the rest of the training period.

---

[4] Further development of the record will also allow the district court to consider whether the Casino explicitly informed the trainees that it would (or would not) pay them during and would (or would not) hire them after the training. The Trainees allege that the Casino had implicitly promised them a job because the Casino needed to and did hire all of the trainees who attended all twelve weeks of the "school" to staff the table games. This allegation, if proved, might support a conclusion that the Trainees "should be considered at-will employees from the beginning." Ensley, 877 F.2d at 1210. Similarly, the Trainees allege that the Casino extensively interviewed all applicants before inviting them to the "school" and that during the "school" the Trainees completed employment paperwork, which, if proved, might be held to have created an "implied compensation agreement." Portland Terminal, 330 U.S. at 152.

13

Accordingly, we hold that the Trainees have alleged sufficient facts to state a claim that the Casino violated the FLSA and the Maryland wage laws.[5]  Although we express no opinion as to whether attending the "dealer school" did constitute "work" and whether the Trainees did constitute "employees" for FLSA purposes, the Trainees have alleged sufficient facts to survive the Casino's motion to dismiss.

IV.

For the foregoing reasons, the judgment of the district court is

<u>REVERSED AND REMANDED</u>.

---

[5] Because the Trainees opposed dismissal of their "Maryland wage law" claims below, and analysis of the existence of an employment relationship is the same under the MWHL and MWPCL as under the FLSA, <u>see</u> <u>Campusano v. Lusitano Constr. LLC</u>, 56 A.3d 303, 307-08 (Md. Ct. Spec. App. 2012), we reverse and remand dismissal of those claims as well.

14