Robert C. **REICH,** Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**SHILOH TRUE LIGHT CHURCH OF CHRIST, d/b/a Shiloh Vocational Training Program, James Rommie Purser, and Gary Leon York, Defendants.**

No. 3:92–CV–444–P.

United States District Court, W.D. North Carolina, Charlotte Division.

Aug. 7, 1995.

Bobbye D. Spears, Robert L. Walter, Atlanta, GA, for plaintiff.

Allen A. Bailey, David C. Cordes, Esq., Charlotte, NC, for defendants.

## MEMORANDUM OF DECISION AND ORDER

ROBERT D. POTTER, Senior District Judge.

**THIS MATTER** is before the Court on cross-motions for Summary Judgment. The Court filed a Memorandum of Decision and Order and a Partial Summary Judgment on February 24, 1995 (documents # 63 and # 64, respectively).

The only unresolved issue left open in this dispute is whether or not the under-sixteen children are employees of the Shiloh Vocational Training Program ("SVTP" or "Shiloh") (See Memorandum of Decision and Order filed February 24, 1995, (document # 63)).

The Court held a trial on May 15 and 16, 1995 on that sole issue.

The Court will make Findings of Fact based on the undisputed material facts set out in the order filed February 24, 1995, the Facts found by this Court in *McLaughlin v. McGee Brothers Co., Inc., et al. and McLaughlin v. Wendell's Woodwork, Inc., et al.*, 681 F.Supp. 1117, (W.D.N.C.1988), and this Court's holding in *McLaughlin v. McGee Bros. Co., Inc., et al.*, 685 F.Supp. 117 (W.D.N.C.1988), *affirmed* in *Brock v. Wendell's Woodwork, Inc., et al.*, 867 F.2d 196 (4th Cir.1989), (hereinafter *"McGee & Wendell's"*) and the facts the Court finds from the testimony and exhibits at the trial held on May 15 and 16, 1995.

### BACKGROUND

In *McLaughlin v. McGee Bros. Co., Inc., et al.*, 681 F.Supp. 1117, the defendants in this case were not parties. That trial ran from January 19 through 23, 1988. This Court found:

1.  Before August of 1986 the minors were working for Defendants on company projects, under supervision of Defendant corporations' officers, and paid directly by Defendant corporation, thus meeting the dictionary definition of an "employee" as a person employed by another for wage or salary.

After August of 1986, the accounting for wages was changed and the minors worked at the same corporate projects but were paid by Shiloh Vocational Training Program, which then billed Defendant corporation for their labor.

In short, Defendants purchased labor from Shiloh Vocational. It was the same dog as before, but a different name from August 1986 to October 5, 1987.

After October 5, 1987, the minors working on McGee construction sites were on the Church Vocational Program payroll which billed the customer directly on invoices prepared by McGee. *Ibid.* at p. 1130.

2. In January, 1988, when the *McGee & Wendell's* trial was completed, Stephen Huntley, who had been employed by McGee Bros., went to work for SVTP until he went back to work for McGee Bros. in December 1989, as a job foreman. (Tr. 10, 1. 1–20). He was a foreman for the SVTP prior to the trial in January of 1988 with minors under 16 working on his crew. (Tr. 11, 1. 15–20).

In this case, it is stipulated that the children over sixteen years of age are paid by the SVTP and are therefore subject to the Fair Labor Standards Act. The only issue before the Court in this evidentiary hearing is whether the children in the SVTP who are under the age of sixteen are employees under the Act. Thus, the Court will confine its Findings of Fact solely to those facts which are germane to that issue. In reaching its conclusion the Court will focus on the facts which will assist answering the general test to be used as enunciated by the decisions of the U.S. Supreme Court and the Fourth Circuit including *McLaughlin v. Ensley,* 877 F.2d 1207 (4th Cir.1989).

*Ensley* relied on *Isaacson v. Penn Community Services, Inc.,* 450 F.2d 1306 (4th Cir.1971) which in turn had relied on *Walling v. Portland Terminal Co.,* 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947) and in summary stated:

... this court has concluded that the general test used to determine if an employee is entitled to the protections of the Act is whether the employee or employer is the primary beneficiary of the trainee's labor.

### FINDINGS OF FACT

1. As was found in the Court's partial summary judgment filed February 24, 1995 (document # 64), ¶1 through 5:

1). the Defendants are an enterprise engaged in commerce that has employed oppressive child labor in violation of 29 U.S.C. §§ 212, 215(a)(4) and 29 C.F.R. §§ 570.35, .52, .58, .65, by employing employees who are sixteen years of age or older, yet under the age of eighteen, in the particularly hazardous occupations of operating power driven hoisting apparatus, performing motor-vehicle driving on public roads in trucks exceeding 6,000 pounds gross vehicle weight, and operating power driven circular or band saws;

2). The Defendants do not have a free exercise defense to enforcement of the Fair Labor Standards Act;

3). The Secretary has not engaged in selective prosecution in violation of the Defendant's Fifth Amendment rights;

4). The Defendants do not have a defense under 29 U.S.C. 214(d).

5). The Defendants do not have a defense under section 29 U.S.C. § 259 and 10(b)28 of the *Field Operations Handbook.*

2. After the 1988 *McGee & Wendell's* trial in January of 1988, the Defendants in this action employed minors over the age of 16 and continued to work on McGee job sites billed through Shiloh from February 3, 1988 until June of 1988. (Tr. 10, 11, 12, 13, & 14).

3. By June of 1988 a crew of minors over 16 worked daily on vocational job sites, and the foreman, Stephen Kent Huntley, was paid a monthly production bonus by Shiloh, based on the same factors prior to the trial in 1988 when he was working for McGee Brothers. (Tr. 11–15).

4. There was not any change in Huntley's activities as foreman for McGee Brothers and what he did on a daily basis for SVTP. (Tr. 15).

5. After the January 1988 trial, Shiloh "pretty much" took over McGee Brothers' projects. (Tr. 16). Huntley was involved in

some new projects started by Shiloh between time of the *McGee & Wendell's* trial in January of 1988 and June of 1988. (Tr. 17). None of the crew on those jobs was under 18 years old. (Tr. 18). Huntley, as a foreman for McGee Brothers, was teaching by his work. (Tr. 20).

6. Alan Dudley Little at the time of this evidentiary hearing was employed by SVTP as a supervisor and instructor. (Tr. 21).

7. When Little started with the SVTP in June of 1988 there were already established crews of minors over 16 years of age performing masonry work for contractors. SVTP charged for the work of those minors over 16 at fair market value rate, based on the square footage of the job done or the number of bricks necessary to do the job. Little was a supervisor for John R. Poore Builders prior to June, 1988. (Tr. 23).

8. The fair market value included both the material and labor component. (Tr. 23, 24).

9. The fair market value rate was already set by the SVTP for work by over 16 year olds when Little come to work for SVTP in June of 1988. (Tr. 24).

10. Shortly after Little came to work for SVTP in June, 1988 minors under the age of 16 returned to perform masonry activities on construction project sites. (Tr. 24).

11. Between June of 1988 and August of 1990 there were 4 crews of minors who regularly performed masonry activities as SVTP project sites, 2 of which were comprised of minors under 16 years old and 2 of which were comprised of minors over 16 years old. (Tr. 24).

12. SVTP subcontracted with builders and contractors to do masonry work on their commercial construction job sites. (Tr. 24).

13. Both the crews of minors under 16 and the crews of minors over 16 did some of the subcontract work for builders and contractors. In fact the first job done by the under-sixteen year olds when they returned to the job sites was for John Poore Builders who subcontracted them. (Tr. 24, 25).

14. As supervisor for the SVTP between June of 1988 and August of 1990 Little obtained the masonry project which the over 16 year old and under 16 year old crews performed. (Tr. 25).

15. As to all of the projects, Little determined the fair market value of the projects to be performed based on the going rate of such labor and market. (Tr. 25).

16. The fair market value rate included the labor and material necessary to do the job. (Tr. 25, 26).

17. There was not any difference in the fair market value of the project based on whether the under-sixteen year old crew did the work or whether the over-sixteen year old crew did the work. (Tr. 26).

18. Little determined which crew, whether under-sixteen year olds or over-sixteen year olds performed work on a job site. (Tr. 26).

19. The determination of which crew was based on the construction activity required by the particular project, the location of the project and the overall schedule of the crews. (Tr. 26).

20. The factors considered in deciding to assign an over-sixteen year old crew or an under-sixteen year old crew were the height of the project, the location, i.e., the distance, the overall schedule and conditions of the job. (Tr. 27).

21. Little had jobs lined up and scheduled ahead of the jobs being performed throughout this period and he had to coordinate a schedule of 4 crews to enable him to meet his various commitments. (Tr. 28).

22. Little had some jobs that he would assign to an under 16 year old crew that, because of scheduling, he had an over 16 year old crew finish the job the under 16 year old crew would have otherwise done. (Tr. 29). The minors under age 16 performed such work as mixing mortar, carrying bricks, laying bricks and blocks, footings, carpentry, framing and boxing. (PX[1] 25).

23. Little had some jobs that had been assigned to over 16 year old crew, and because of the work load and the need to keep

1. "PX" denotes Plaintiff's Exhibit. "DX" denotes Defendants' Exhibit.

the schedule going, he assigned an under-sixteen year old crew. (Tr. 29–30).

24. Whether an over-sixteen year old crew did the work or an under 16 year old crew did the work, the customer was informed of the fair market value and invoiced for the project by Shiloh. (Tr. 30–31).

25. If the under-sixteen year old crew did the work, it was Little's practice to tell the customer to write two checks, one for the material costs and the second for the fair market value of the under-sixteen labor. (Tr. 31).

26. The administrator, Gary York, told Little to do that. (Tr. 31).

27. Little asked for a check for the material. He did not ask for a check for the fair market labor. He would say to the customer, if you want to make a donation to the church it could be done, but he did not ask for a donation. However, he did provide the customer with what would be the fair market value of the labor. (Tr. 31).

28. Little did not know whether or not all the customers in relation to projects performed by under 16 year olds paid for the materials. He did know some did. (Tr. 31–32).

29. Little was not aware of any job when the customer did not pay the fair market value of the labor for the work performed. (Tr. 32).

30. With the exception of 5 national holidays the SVTP crews worked five days a week 52 weeks a year. (Tr. 32).

31. This is true for both the over 16 year olds and the under 16 year olds, since 1988. (Tr. 32).

32. During the summer, the minors under age 16 work on SVTP construction projects the same hours as the crew over 16 year old minors except where the over 16 year olds may have to stay longer to finish a project. (Tr. 32, 33). The under 16 year old crews usually leave the project about 4:30 p.m. and normally start about 7:30 a.m. during the summer months. (Tr. 33).

33. During the school year one crew of under 16 year old minors comes to work on projects in the morning for approximately 3½ hours and then another crew of under 16 years old comes to work in the afternoon. (Tr. 33).

34. SVTP records a minor under 16 years old in the record with a check mark for a full day of work in the summer and a half day work during the school year with "½". If weather prevents work at the job site there is placed a "C" for church class. (Tr. 33–34; PX 7).

35. PX 7 is an attendance record. (Tr. 35).

36. After August of 1990 all the construction crews had minors under 16 years of age mixed with minors over 16. (Tr. 40).

37. If a 15 year old had his high school diploma and he was working full days he would not be paid because of church policy. (Tr. 36).

38. The basis of the church policy of being 16 before paying for his labor is incentive, but Little did not know the reason. (Tr. 36, 37). After August 1990, all crews that had minors under 16 were mixed with minors over 16. (Tr. 40).

39. PX 6 is a compilation of SVTP invoices to customers for masonry work performed between June 1988 and September 1990. PX 63 is a list of 35 projects performed by under 16 year old crews between June 1988 and July 1990. (Tr. 41 & 42).

40. The under-sixteen year olds did subcontract work for building contractors when they came back in 1988. The contractors included Mike Starnes Builder, Johnny Griffin, builder, John Poore, builder, Wilbert Ennis and Steve Hunter, builders. (Tr. 46–58; PX 10 & 63). The church representative, Mr. Little, discussed with building contractors the fair market value of labor on those jobs. (Tr. 43–44).

41. Each of the invoices in PX 6, PX 10, PX 63 reflects a general construction class of the Shiloh program on which jobs over-sixteen year olds and under-sixteen year olds worked. The under-sixteen year olds were not paid for their work on those jobs. (Tr. 43–53). Not all the jobs on which the under-sixteen year olds worked appear on PX 63. (Tr. 50–56). Under-sixteen year olds drove

forklifts on the job and used masonry saws on the job during 1988 and 1989. (Tr. 50). DX 64 is Defendants' second supplement to Defendants' answers to Plaintiff's first set of interrogatories. DX 64 is a compilation of 97 projects performed by male or female employees under age 16 in connection with SVTP, between May 1990 and July 1993. (Tr. 100). The projects included all types of construction work including but not limited to remodeling houses, pouring concrete slab, installing a brick fireplace, laying a brick foundation under old garage, concrete walks, laying brick lattice wall around pool, concrete/masonry retainer walls, hanging sheetrock, laying brick steps, installing a glass block wall, underpinning a mobile home, adding a room to an existing house, adding storage room to garage, carpentry work, building a carport. In addition to the 97 projects, the SVTP built 15 complete new houses. All the minors who worked on the projects including those over and under 16 years of age were labelled "student trainees," and not employees of the program.

42. McGee Brothers Company adult employees sometimes worked for the SVTP as a disciplinary measure by McGee Brothers, and worked with the under-sixteen year old crew. (Tr. 59).

43. Over-sixteen year olds who had not worked prior to turning 16 came to work for the program and worked with the under-sixteen year old crew. The over-sixteen year olds on those occasions were paid for their work. (Tr. 60–62).

44. In 1990, SVTP began to construct new houses. (Tr. 62).

45. SVTP provided labor day minors under the age of 16 to build a new house on Ava Street in Monroe, North Carolina. (Tr. 62).

46. PX 63, 67 lists the minors under 16 who provided labor for the house on Ava Street in Monroe, North Carolina, started from scratch. The over-sixteen year olds did the roof. Plumbing, heating and electrical was to subcontracted. (Tr. 63, 64).

47. Under-sixteen year olds and over-sixteen year olds provided the labor to build the house. PX 67, p. 18, purports to list imaginary salaries from March 2, 1990 which was "a rate of, a grade that we used to grade the students". (Tr. 64–65). The SVTP did not grade minors over 16 on an hourly rate. There were real rates for minors over 16 and imaginary rates for minors under 16. (Tr. 65).

48. The imaginary hourly rate of the minor under 16 was a grade and the hourly rate of the minor over 16 was started to give incentive to the boys and let them know where they were with their knowledge, and would also let them know at what rate of pay they were they'd get paid when they turned 16. (Tr. 65–66).

49. In June 1988 when the minors under 16 began working again they were assigned imaginary rates of pay which were the same rate they were being paid in December 1987. (Tr. 66) Gary York came up with the imaginary rates. (Tr. 67).

50. When they turned 16, the imaginary rate became real and they were paid based on their imaginary rate of pay for all hours they worked immediately thereafter. (Tr. 66).

51. Page 1 of PX 67 reflects that Travis McGee was working on the Ava Street job site at a 10 dollar and 50 cent imaginary rate of pay as of March 2, 1990 as reflected on page 18 of PX 67. (Tr. 68).

52. Travis McGee had been working on construction projects for McGee Brothers for a number of years prior to the trial. (Tr. 68).

53. Travis McGee, under 16 years old, had been working almost two more years after he went back to work in June of 1988 according to PX 67. (Tr. 69).

54. Travis McGee would have been paid $1,386 in wages for the 132 hours he worked at Ava Court in Monroe in 16 days if his imaginary rate were paid to him, and SVTP would have incurred $13,034 in labor costs if it had paid the minors who performed 1,752 of labor in 16 days at their imaginary rates. (PX 67, p. 18; Tr. 69). During the work on Ava Court Travis McGee turned 16 and started getting paid. (Tr. 69). When Travis McGee was working on the Ava Court property in 1991, the program would call him a

trainee. Little was not a trainee but he would consider all of his work to be training. Travis McGee was an employee in 1991, but when he did the work previously on the same job in 1990 he was not an employee; he was a student and a trainee. (Tr. 70). Travis McGee was an employee when he worked on the job site the second time, but not the first time because the second time he was being paid by the church. There was no other difference. (Tr. 71). Travis McGee was an employee after he was paid by the church. (Tr. 71).

55. In August, 1990, SVTP quit using separate crews of over and under 16 year olds on job sites and created mixed crews with over and under 16 year olds working side by side on the same crew. (Tr. 74). As of June 1990, the under-sixteen year olds were working and building houses. (Tr. 73).

56. The minors under 16 years old were building houses before the over and under 16 year olds crews merged in August 1990. (Tr. 69–75; PX 67 & 68).

57. The under-sixteen year olds were doing the same tasks when the crews merged that they were doing before the crews merged. (Tr. 76–77).

58. After August 1990 on these mixed crews the minors worked on the same projects, used the same equipment, were under the same foreman and did the same construction tasks as each other. (Tr. 77).

59. In the substantial majority of cases where new homes were built by the SVTP a person approached someone associated with the program gave the SVTP the plans or specifications and SVTP prepared an estimate of cost. (Tr. 78–79).

60. The estimate included the labor costs, subcontract costs, material costs, phone calls, mileage to and from the job, an administrative cost, construction interest. In the case of Louis Smart, he was charged $12,000 for the house constructed for him in addition to the actual cost to the program of building the house. (Tr. 79–86; PX 40). Defendants received in excess of $386,600 for the three houses constructed for Smart by the minors. (PX 31, 32, 38, 64 or DX 4 & 5). Defendants built and sold a house to Jeff Stegall for $80,000.00 and one to Wayne Helms for $124,250. (PX 64, pp. 4, 2).

61. Since 1993 and at the time of the evidentiary hearing SVTP has been building houses. (Tr. 89). Two houses were in the process of being built during the evidentiary hearing utilizing under-sixteen year olds. (Tr. 88).

62. The SVTP performed a number of construction jobs involving under-sixteen years old and over-sixteen year olds, as well as a mixture of those crews. Each job was performed at cost, plus administrative fee, and interest. (Tr. 90–99; PX 45). One example of those costs is the house for Louis Smart which reflected a charge of in excess of $12,000 in addition to the job total cost. (Tr. 83, 86).

63. PX 64 lists 97 jobs performed by minors under 16 in connection with the SVTP between May of 1990 and July of 1993. (Tr. 100).

64. The under-sixteen year olds on project sites learn the different sizes of materials used on job sites, trying to keep the property clean, various skills in the carpentry trade and masonry trade. They learn the skill of reading measurements, different sizes as to lumber, blueprint reading, type of material, how to mix mortar, how to spread mortar, how to put out brick. (Tr. 106).

65. The under-sixteen year olds are not considered by the Defendants to be employees. (Tr. 109).

66. The participants in the program wind up with different jobs such as masonry skills, carpentry skills, ceramic tile, landscaping, interior trim. (Tr. 114).

67. By mixing the under-sixteen year olds and over-sixteen year olds in the same crew, the under-sixteen year olds could learn from the over-sixteen year olds. (Tr. 118).

68. The under-sixteen year olds were not paid for their time. (Tr. 120).

69. The program never charged for labor cost, but did receive from time to time donations from customers. (Tr. 123–124).

70. It was made known to under-sixteen year olds who joined the program that they

would not be paid until they graduated from high school and turned 16. (Tr. 125).

71. Whether a participant had or had not graduated from high school, he would not be paid until he was 16. This was church policy. (Tr. 126).

72. If an applicant had not graduated from high school, he would not be paid even if he had reached 16. (Tr. 126).

73. The SVTP in addition to construction skills emphasized a dress code, neatness, no profanity. It also emphasizes attitude, and evaluates performance of participants, attendance, tardiness. (Tr. 140–141).

74. Mr. Alan Little, supervisor and instructor for the SVTP, testified that it is a requirement that wages be paid to minors over 16 because the law requires payment to those who are employed for the hours they work. (Tr. 149).

75. There is a "little bit of difference" between the work activities on the job site between minors under and over 16 years, in that the ones under 16 are not as experienced as the ones over 16, according to Little. (Tr. 150).

76. However, Little testified that he has had individuals come to work for the program over 16 and that he has had quite a number of minors under 16 that are more proficient at their work than those who are over 16. (Tr. 150–151). The Court finds as a fact that the attribution to church policy to not pay the minors under 16 is an attempt to label them students rather than employees.

77. Alan Little was instructed by Alan Leon York to tell customers to write 2 checks to the program if they chose to do so—one for the actual cost and one as a donation to the church at their discretion, based on whatever the customer wanted to pay. (Tr. 158). Alan York was the Administrator of the SVTP. (Tr. 157).

78. Alan Little was informing the customers of the fair market value of the labor in some cases. (Tr. 158).

79. Prior to the McGee trial in 1988 both over and under-sixteen year old minors associated with the SVTP were being paid wages for the program. (Tr. 159–160).

80. In June of 1988 minors under the age of 16 returned to work on SVTP construction sites. However, the minors under 16 were not paid for hours worked for SVTP, but minors over 16 were paid. The minors under 16 were not paid because, even though they produced work, the Defendants claim they were students. (Tr. 160–161).

81. There is no instance in which a minor over 16 with a high school diploma who came to work for SVTP was not paid for hours worked. (Tr. 163).

82. In June of 1988, minors under the age of 16 were assigned imaginary pay rates, which was the same rate of pay the minor had been receiving at the time he was working prior to the trial in 1988. (Tr. 163–167).

83. If a minor who was 16 years old with a high school diploma with no construction experience joins the program it could be that Shiloh would pay him. It would have to be discussed with church management. There is no instance in which a minor over 16 who came to work at Shiloh was not paid wages for hours worked. (Tr. 163).

84. In June 1988, the minors under 16 were assigned imaginary pay rates (Tr. 163), and given periodic imaginary pay raises (Tr. 166, 167). The minors over 16 are assigned an hourly rate of pay and given periodic pay raises. (Tr. 163).

85. When the minor turned 16 and would be paid for his hours worked on the SVTP construction sites he was paid at his last imaginary pay rate. (Tr. 167).

86. The SVTP conducts monthly business meetings the first Monday of each month, which are attended by the entire church, including the minors. Rommie Purser conducts the meeting and York speaks primarily to the minors regarding certain phases of the SVTP. (Tr. 168).

87. Gene Griffin takes minutes of the discussions at the meetings. (Tr. 168).

88. At the first meeting on July 4, 1988, after the minors under 16 came back to work on June 8, York told the minors under 16 that he hoped that when they became 18 that he would pay them when they became 18 for

what they were doing at that point. (Tr. 169–170; PX 72, p. 5 SVTP minutes, 7/4/88).

89. York, at that point, was keeping records of the attendance on job sites by the minors, and also of their imaginary pay rates and interest. (Tr. 170).

90. York first denied that the minors under 16 who work at Shiloh construction projects were given payments based on their work in the program at least in December, 1988, March, 1989, and December, 1989. He then admitted a payment was made to each minor under 16 doing masonry work and house cleaning between June 8, 1988 and December 1988. (Tr. 170, 171).

91. When asked whether the payment was based on how long they had worked during that period, he answered "not necessarily." (Tr. 171, 1. 8–10).

92. When asked what the payment was based on, York stated it was based on a gift that the church chose to give the students for their participation in the program and for encouraging them as much as they could to participate and do their best in the program—that it was a gift. (Tr. 171, 1. 11–15).

93. York further testified that the pay that the over-sixteen year olds were getting was "somewhat" to serve the same purpose as well. (Tr. 171, 1. 11–18).

94. When asked "Do you remember whether payments were based on how long the minors had worked between June '88 and December '88?", York answered "Yes." When asked if the payment was based on how long they had worked, he stated "not necessarily that only. That was part of it." (Tr. 171, 1. 19–23).

95. Further testimony by York was to the effect that only minors who had worked on projects during that period received Christmas gifts, and that the boys who had performed masonry work on those sites and had been working since June of 1988, each received two thousand dollars. (Tr. 171–172).

96. York further testified that minors who had worked on Shiloh job sites but did not start on June 8, 1988, received $600.00 even though they may not have worked the

full time. The Defendants termed this a gift. (Tr. 172–173).

97. Each minor who had been doing house cleaning work was given $100.00. (Tr. 174).

98. On March 29, 1989 which was the end of the next quarter after the December 1988 payments, the church made payments to 30 minors under the age of 16 who had worked on SVTP jobs in that quarter totalling $58,-500.00, by transferring the money to their individual accounts opened for minors at various times, some of which were utilized to have the pay the minors received when they were working on McGee Brothers job sites put into these trust accounts. (Tr. 176, 177; PX 69).

99. The amount of money paid to each minor (under 16) in this $58,000.00 payment was based on the minor's imaginary pay rate, length of time in the program, conduct and achievement in the program. (Tr. 177, 178).

100. If two minors had been in the program for the same length of time, individuals who have more experience, proficiency in laying brick, and doing small carpentry work were paid more, and the minors' imaginary pay rates reflected experience and proficiency in laying brick and doing other work in the SVTP. (Tr. 178). For example, Brandon McGee received $5,500.00 and Travis McGee $5,000.00. (Tr. 178; PX 69, p. 6).

101. York testified that the payment to the under-sixteen year olds was a gift. However, he also testified that it was paid only to the minors in the program, and was based on the imaginary rates of pay and the length of time and performance in the program. (Tr. 179).

102. York became aware a month or two after these payments were made to these minors under 16 in March of 1989 that the Department of Labor had begun asking the program for information regarding the work of minors in construction, and was concerned regarding the fact that the church had made this quarterly payment to the minors in March of 1989 of some $58,000.00. (Tr. 179, 180).

103. York was concerned that it may appear the church was trying to pay the stu-

dents which was not their intent and they started looking at the program as to how they could more nearly comply with the rules and regulations. (Tr. 180).

104. York, Rommie Purser, Gene Griffin, and W. James Chandler (who had represented *McGee & Wendell's* in the 1988 trial) met with the vice president of the bank.

In order to have a complete picture the Court will quote from the transcript of what transpired at that meeting; pages 180 through 188 of the transcript, Gary Leon York, Sr., the administrator of the SVTP is testifying:

Q. And at that meeting, did Mr. Chandler mention to the bankers that Bill LoPresti, the investigator for the Department of Labor, had contacted Rommie and you for information?

A. Yes.

Q. And did Mr. Chandler ask the president of the bank what could be done not to leave an accusatory paper trail?

A. Yes.

Q. Did he further state that he was sure, did he further state, did he further explain to president of the bank, Judge Potter would never believe that this was a church matter?

A. I don't recall that. Would you read that again?

Q. Okay. Did Mr. Chandler further explain to the president of the bank, Mr. King, that Judge Potter would never believe this was a church matter?

A. I don't recall that.

Q. If you could read the third paragraph, if that would assist you? Does reading that refresh your recollection?

A. I don't remember that being stated. It could have been. but I don't recall that.

Q. What was your understanding of what Mr. Chandler meant, that he was, wanted the bank to do what it could do so there would not be an accusatory paper trial [sic]?

A. Well, what we were meeting about was to see if there was any way that a church could give a gift to members of the church or children of the church and it be legal.

Q. Why would a banker be the person you would ask that of?

A. I would think they would know.

Q. How would they know whether giving a gift to a minor would be legal under the laws, under the labor law, for instance?

A. I couldn't answer that.

Q. Weren't you, in fact, meeting so that you could see if there was a way not to have an accusatory paper trial so that the fact of this transfer would not be disclosed at a subsequent hearing?

A. No.

Q. Then again, let me ask you what, what do you believe Mr. Chandler meant when he said what could be done not to leave an accusatory paper trail?

A. Well, I know what the question implies, but I can't tell you what he actually meant unless he was saying that we don't need to leave a paper trail, that it may appear to be a cover-up or whatever. I don't know.

Q. Well, the cover-up would be trying to go to the bank to have something done so there would not be a paper trail as to what you had done, is that not true?

A. No. Going to the bank, as I stated earlier, was for the purpose of seeing if there was anything that could be done or if there was any, any way laws that they knew of or whatnot that this could be done.

Q. That what could be done?

A. That this money could stay where it is or was.

Q. Did your attorney have a problem with that and you had to ask the bank for that advice?

A. I don't know.

Q. So by meeting with this, at this meeting, was your hope that the monies would be able to stay in there and there would not be an accusatory paper trail?

A. I don't know that the paper trial [sic] was the, was the issue. The issue was, is there a way to leave it there or would it be legal or whatnot to leave it there. Was my

understanding of it. I don't know what Mr. Chandler's idea was.

Q. Did the banker, Mr. King, tell you there was no way to leave a, avoid a paper trial [sic] by redepositing the funds to the church?

A. He may have.

Q. Okay. Why don't you read the next to last sentence on the first page and see if that refreshes your recollection?

A. Evidently he said it.

Q. And did Mr. Chandler offer to write a letter to the bank stating that by virtue of an accounting error, it was necessary to make a transfer back to the church account?

A. Yes, he did volunteer to write a letter, yes.

Q. Okay. What accounting error had occurred here?

A. I don't know.

Q. You intended to transfer the money in March of 1989 into these accounts; did you not?

A. They were transferred.

Q. Intentionally?

A. Yes.

Q. Okay. Did Brother Rommie in a meeting with you that day state that quarterly contributions to the students would be stopped?

A. I would, I don't recall that, but I would say he did, yes.

Q. And did he further state that when the minors under 16 became 16 or 18, there might be a way to pay them annually an amount of 10 thousand dollars until the amount they should have earned had been paid off?

A. I don't recall that, but I wouldn't deny that because I don't, I don't remember that conversation other than the contributions being stopped, meaning these payments.

Q. So there was an attempt to account for those contributions; isn't that correct?

A. Yes, legal.

Q. And ten thousand dollars is the amount that you just testified, when you made the first payment in December '88,

you called the IRS, and ten thousand dollars is the amount of money you can give as a gift without tax consequences; isn't that correct?

A. Yes.

Q. Do you recollect Mr. Chandler suggesting saying, I'm sorry, I don't know as the standard response when a person is asked something they are not sure how to answer in relation to the program?

A. Do I recall that? Is that your question?

Q. Yes, sir.

A. No, I don't.

Q. Do you recall him saying that the church's whole system is built on trust and that's an advantage? If the church had to go to court, they would be treated a lot nicer with Judge McMillan?

A. I don't recall that.

Q. Do you know what he would mean by it being an advantage in court that the church's system is based on trust?

A. No, I don't.

Q. Do you remember, if you look down at the fourth paragraph, that Brother Rommie said that any cash deposited in the students' accounts had been based on the length of time they had been in the program and how the instructors perceived their level of skill?

A. Yes.

Q. And isn't that what you base your pay rates on for your employees over 16?

A. That, yes, that's, that's a major part of it.

Q. And did Mr. Chandler then recommend that no money be given as a gift commensurate with wages and said it would be much better not to disburse any money right now, give them a call before something else was done?

A. Yes.

Q. Okay. Did you mention that time books were being kept for 16 and 18 year olds?

A. Yes.

Q. Why was that a concern to you?

A.  Well, it was just a record of the employees that we had, 16 to 18.

Q.  Time books, attendance is supposed to be kept for minors under 16; isn't that true?

A.  Yes, but this was 16 to 18 year olds.

Q.  And did Mr. Chandler state that, was the decision made that Mr. Chandler would write a letter to the bank stating that the funds were deposited in the individual accounts through error and should be redeposited in the church account?

A.  I believe that was said, yes.

Q.  Okay.  Now, why would the decision be made that there would be a letter saying that the funds were deposited in error when, in fact, they had been deposited intentionally?

A.  Well, we found out after we did it was an error.

Q.  Oh, the error was not doing it but concern over you had done something wrong.  Is that—

A.  No, no.  The error was that after the discussion with Chandler and the bank, it appeared that we had done something that probably would not be in the best interest of the church so we decided to reverse it.

Q.  Yes.  Other than telling you that there's nothing they could do to avoid an accusatory paper trail by redepositing the funds, what did the bank tell you that had anything to do with whether or not this was an error?

A.  They just said that they didn't know any way of a gift of this type could be put into a savings account under the circumstances after he heard some of the things that was discussed in that meeting with Chandler.  He said he didn't know of any way that that could be done.

Q.  What were those circumstances?

A.  The circumstances that was discussed with Chandler you're speaking of?

Q.  Yeah.

A.  Apparently Mr. King, after hearing the circumstances, said that this couldn't be legally done.

Q.  And the church could not apparently make a payment into a minor of the church's account based on the circumstances that had been told to him?

A.  Well, the circumstances being that it appeared that we were trying to pay these boys and that that was really not the intent.  And that he said, he didn't know of any way that that could be, be done.

Q.  Okay.  From a banking point of view, why wouldn't, what from a banker's point of view would be wrong with you depositing money in these accounts?  Doesn't the, doesn't the church regularly deposit money into these, into minors' accounts?

A.  Not regularly, no.

Q.  Well, didn't it before—in December 1988, it did; did it not?

A.  Yes.  No.

Q.  1987, I'm sorry.

A.  '87, yes.

Q.  And there was not a problem with that, then, from a banking point of view, was there?

A.  No.

Q.  And now they—you're doing the same things into the same accounts, what would be the problem from a banking law?

A.  Well, there wouldn't be a problem, and that's what Mr. King said.  There wouldn't be a problem with him.  But he saw no way that, what he understood that we were, were in a situation of, that looked like we were trying to pay the boys, he said, I don't know that you can take a gift and, you know, and make it appear that it's a gift and not from the things that was discussed that might be presented to the Government that we were trying to cover up something.

### Findings of Fact (cont'd)

105.  York told the Monthly Meeting of the SVTP on August 7, that the under-sixteen year olds cannot contract to do work and no invoices are sent for the work but people do give donations to the church.  (Tr. 189).  He further stated their work had been handled in the same manner ever since the trial, that some mistakes may have been made, but York had no intention of backing

down on the vocational training. (Tr. 189–190).

106. York also told the meeting that money was being set aside and will be paid to the young boys and girls whenever it is legal to do so. This was related to Rommie Purser's suggestion that "you" (the church) could pay monies annually after they reached a certain age for the work they had been doing under 16. (Tr. 190).

107. York testified that it appeared the church was breaking even when the work of the senior crews is combined with the junior crews. (Tr. 191).

108. York takes the position that money that was coming in based on the fair market value of the labor of minors under 16 was just a donation to the church and not related to the work. (Tr. 191–192).

109. The contract crews before 1990 was [sic] invoiced for the work SVTP did for fair market price. After 1990, nobody was invoiced for anything. (Tr. 205).

110. PX 70 indicates the Shiloh True Light Church of Christ Vocational Training had a workmen's compensation policy in effect as of 10/28/87 and indicates the employers operate as a vocational school operated by the Shiloh Church. The total masonry payroll at that time was $437,000.00. (Tr. 211; PX 70). In 1990, the tax related documents reflect total wages in 1990 were $434,985.13. (Tr. 209; PX 29). These wages were only for the over-sixteen year olds and instructors and did not include any wages for the under-sixteen year olds.

111. Defendants' Second Supplement to Answers to Plaintiff's Interrogatories, signed by York, on the second page indicates "all the minors who worked on the projects, including those over and under the age of 16 years were student trainees and none of the minors were employees of Shiloh True Light Church of Christ at the time they performed work on the projects." (Tr. 213).

112. In response to the First Request for Admission, York signed the verification and admitted that the minors over 16 were employees and that the minors under 16 were employees. Now, he takes the position that the under-sixteen year olds are not, but also

says nothing has changed. (Tr. 214). The over-sixteen year old girls and under-sixteen year old girls did the same work, but the over-sixteen year olds were paid and considered employees, but the under-sixteen year olds were not paid and were called students. The last girls quit in 1994. (Tr. 215–216).

113. Cross-examination of York by defense did not add anything new as far as the issue before the Court is concerned.

**Mr. Gene Griffin's Testimony:**

114. In the spring of 1985 Rommie Purser asked Gene Griffin to keep a diary of anything pertaining to the vocational training program that might be helpful to the program in case the Department of Labor were to bring a lawsuit against the program. (Tr. 248).

115. Since that time Griffin prepared minutes of meetings that pertained to the SVTP, writing the minutes as a disinterested party from handwritten notes he took at the meetings, and typed the minutes in some cases. When he typed the minutes the events were still fresh in his mind. (Tr. 249).

116. PX 72 is a copy of the minutes taken at the meetings for July 4, 1988, August 1, 1988, May 11, 1989, and August 7, 1989. (Tr. 249, 250).

117. Cross-examination of Griffin by Defendants reflected in Tr. 250–257 developed the facts in FF 118–124.

118. Griffin also took notes and wrote the minutes of a particular meeting which occurred in the office of James Chandler, the attorney at that time for SVTP. (Tr. 251).

119. When asked why the meeting occurred, Mr. Griffin explained that some gifts were given to some of the students which Brother Rommie had decided to do before the meeting in Chandler's office. Griffin was not at the meeting that decided to make the gifts but Brother Gary had told him later that the gifts had been given, and they were deposited directly into their SVTP account from the church fund. (Tr. 251–252).

120. The purpose of the meeting was that the attorney who represented the program at that time (Chandler) felt it was a mistake to

have given the gifts to the children, so they met with Chandler, Joe King, and Andy Anderson from Home Federal, to find the legal way to remove the money from their accounts and put it back into the church fund. As a result of the meeting the money was taken out of their accounts and put back in the church's fund. (Tr. 252).

121. Griffin's understanding of the purpose of the gifts in the first place was that Brother Rommie felt like that the students needed some kind of motivation, and he felt that a gift of money would be the best motivation. (Tr. 252).

122. It was not the church's motivation to pay them a wage. It was not the church's motivation to pay them for the work they had done, it was more in an effort to encourage future participation in the program rather than past participation in the program. (Tr. 253).

123. The money was originally given and then taken from their accounts, but was never given back to them again because the SVTP felt it was a mistake to have given it to them in the first place. Griffin was not aware of any deposit to the children at a later date. (Tr. 253–254).

124. Griffin further testified that at the meeting at Home Federal was the only time Rommie Purser mentioned that when the children reached 16 or 18 there might be a way to pay them annually an amount of $10,000.00 until the money they should have earned had been paid off, but he never pursued it, and the church never found a way to or in fact make any payments to the children. Griffin further testified that he was never asked to cancel anything that took place at any meeting, that Brother Rommie repeatedly told him they had nothing to hide and not to hold back on any of the minutes. He further testified that it was his practice not only to take notes of the things said by church members at the meeting but also of anyone else including Mr. Chandler and Mr. King, and that he further had left out nothing intentionally. (Tr. 255–257).

Redirect by the Plaintiff developed FF 125–130.

125. On March 29 and 30, 1989, the church transferred $58,500 into the minors' account, and that within a month or two after that the Department of Labor began their inquiry into the construction activities of the SVTP, between the transfer and the meeting at Home Federal. (Tr. 257–258).

126. The Department of Labor's inquiry raised a concern as to whether the payment of money to the minors was done in accordance with the law. (Tr. 258).

127. As a result of that concern a meeting was held May 11, 1989 at Home Federal and at that meeting Chandler discussed Judge Potter not believing that this was a church matter and therefore they wanted to take some action as to what had happened. Chandler asked King what could be done so as not to leave an accusatory paper trail, and Griffin assumed "... that he—if it were possible to have erased the fact that the money was given to the children and then taken back." (Tr. 258–259).

128. Griffin and Brother Gary did not feel that they were going to the bank in the hope that the bank could do something for them that would not leave a paper trail so that it would not be evident to the Department of Labor. Griffin and Brother Gary just wanted to do it in a proper manner, and they asked the attorney and King. (Tr. 259). Griffin and his associates did not ask if there was any way to eliminate it. That was the attorney's (Chandler's) thought, and Griffin and his associates did not always agree with what an attorney made a comment on. (Tr. 260).

129. Chandler offered to write a letter to Home Federal stating that by virtue of an accounting error, it was necessary to transfer the money back, but Griffin did not know that there was an accounting error. SVTP intended to transfer that money in March of 1989. (Tr. 261).

130. It was not an accounting error and Griffin would not necessarily have agreed with what he'd said. (Tr. 261).

The next witness called by the Plaintiff who testified as follows was Richard Allen Bush, from whose testimony FF 131–144 were developed.

131. Bush is an instructor with SVTP who oversees SVTP crew of minors over and under 16 years of age who build new houses and do remodeling and other construction jobs for customers since 1989. (Tr. 266). He attempts to record meticulously every actual cost incurred by the SVTP doing the job, even to an item of .03 tax, (Tr. 272), and .12 tax (Tr. 270), and .56 material expense (Tr. 271), for example. (Tr. 266–296). He testified that he oversaw SVTP crews of minors both over and under 16 years of age who build new houses and do remodeling and other construction jobs for customers. In short, the under-sixteen year olds do the same work on the same days and at the same site as the over-sixteen year olds. (Tr. 266–267; PX 35, 43, 44, 47, 65, and 67).

132. Bush considered anyone who is not paid is a student and anyone who is paid is a student/employee. The day they have a high school diploma and are 16, they begin to be paid and then they are an employee. (Tr. 275–276).

133. Under-sixteen year olds in the SVTP take part in all phases of house construction—foundation, framing phase, roofing, veneer work which includes laying brick and mixing mortar, putting on vinyl boxing material, installing drywall. (Tr. 276–280).

134. Dalton Reynolds and Travis McGee started to work in the SVTP on June 8, 1988, when Reynolds was 14 years old, and McGee was 13 years old. PX 65, p. 2, indicates Reynolds who was born 5/18/74 started to work in the SVTP on 6/8/88 after the *McGee & Wendell's* trial (the 1988 trial) and became officially employed on *10/19/90*. (PX 65, p. 2) and Travis McGee born 5/14/75 started to work in the SVTP the same date (6/8/88) and was officially employed by SVTP on 5/17/91. (PX 65, p. 4). McGee had been employed by McGee Brothers Company, Inc. until the 1988 trial. They continued to perform the same work after they were officially employed by SVTP that they were performing before that date. By 1990 Travis McGee was a fairly accomplished mason, having worked for McGee Bros. prior to 1988 and in the SVTP program since 1988, but he was not being paid until May 1991 when he was 16 years old. Mr. Bush testified that the differ-

ence was "Mr. McGee was still in training. He was still acquiring skills that possibly he had not yet achieved." (Tr. 282, 1. 23–25; 283, 1. 1–4). When asked: "He was doing that in 1992 after he was being paid, is that true?" (Tr. 283, 1. 5–6), Bush answered: "That's correct." (Tr. 283, 1. 7). Bush also testified that Reynolds was doing the same thing before and after he was 16, and that they were all being trained every day regardless of whether they were being paid, and he answered "That's right." (Tr. 283, 1. 8–18). He further testified that he did not know the difference. (Tr. 283, 1. 14–20).

135. Bush later testified that the difference in the work was when they are under 16 they require more supervision directly from him. They haven't achieved the 16th year. They haven't received their diploma yet and when they do turn 16, they do get their diploma, they have graduated into another area with us and they become paid. (Tr. 284, 1. 17–22). Bush had testified previously that the policy or requirement of the Church that the "trainees" had to be 16 and have a high school diploma before they could be paid and would be an employee. (FF 132). Mark Kaumm's record was kept by Brother Alan Little. He was 16, but did not have a high school diploma, yet he was being paid by SVTP. Bush did not know why. (Tr. 292–295).

136. Bush testified that although we are doing the same types of work, there is something to be learned in everyday life everyday in those fields. (Tr. 284, 1. 23–25). He further stated that it was true if you are 16 and that's true if you are 15. (Tr. 285, 1. 1–3). Bush further testified that a minor who comes to the program and is 16 and has no prior construction experience is going to require more supervision than Travis McGee when he's 15 and has been doing construction for nine years. (Tr. 285).

137. DX 73 admitted. This reflects that the minors did not meet in class during November or December 1994. (Tr. 290–296).

*Cross–Examination*

138. On cross-examination, Bush testified that when an under-sixteen year old came to work he would stay with Bush observing the

things Bush did. He further testified that when the under-sixteen year olds join the program, they are usually 11 or 12. (Tr. 297).

139. When an under-sixteen year old came to work they mix mortar, pick up bricks, learning to use a trowel, and lay brick. (Tr. 298–301).

140. The learning process slows down the work, but it is a learning experience. (Tr. 303, 304).

141. The under-sixteen year olds are also taught the Pythagorean theory, square root, safety, and they are evaluated daily starting in January 1995, and monthly before then. They are also taught how to read blueprints, record keeping, job estimates. (Tr. 305–315).

142. The remainder of the cross-examination had to do with experience, maturity tests given to participants. (Tr. 315–325).

### Re–Direct

143. A 14–year old who has been working for three to four years is fairly productive. (Tr. 329). Many minors come to the program when 11 years old. By the time they have been with the program six months they are more productive and are actually doing brick work—spreading mortar, and by the time they have been there a couple of years they are substantially more experienced and substantially more productive. By the time they have been working three or four years they enhance the productivity by their presence in the program. By the same token someone like Mark Kaumm who had no experience was not that productive. (Tr. 328–329).

144. The following exhibits were admitted by stipulation or otherwise: 1, 2, 3, 4, 6, 7, 8, 10, 16, 17, 18, 20, 23, 29, 30, 35, 40, 43, 44, 45, 47, 53, 54, 56, 57, 58, 59, 60, 61, 63, 64, 65, 67, 68, 69, 70, 72, 73, 74, 75, 76.

### Defendants' Evidence

145. Robert C. Rice, Jr. was called as an expert witness in the field of accounting. His summary opinion was that none of the projects of the SVTP were profitable, that all charges were reasonable, and the quality of work was good. (Tr. 341–359).

### Cross–Examination

146. Mr. Rice testified that the documentation given to him is probably not the kind of documentation he would rely on to produce a financial statement, it was not complete enough. (Tr. 378). Rice had no information as to the amount received by SVTP for 61 of the 97 projects on DX 12. Thus, his testimony is not based on sufficient documentation and cannot be given much weight by the Court.

### Testimony of Dr. Clifton Belcher

147. Mr. Belcher was accepted by the Court as an expert in the field of vocational and technical education. (Tr. 387).

148. In addition to talking to the instructors in the program, Mr. Belcher talked with the students and was satisfied that the students were in a continued education learning environment and a program whereby they were progressing incrementally in stages as they moved along through the years of involvement. (Tr. 393).

149. Mr. Belcher opined that the under-sixteen year olds are benefitting from the program because of the continuity of the program the prescribed progressive activities and the length of time they are able to stay with those activities, and that offers a significant benefit to them. (Tr. 397).

150. Belcher further testified that on-site vocational educational programs are more effective at teaching some subjects rather than straight from a textbook in a traditional classroom setting since in the building trades it is very important to know and to perform each step accurately. A student may capture the learning mentally but if they can't do it, then it's not of much benefit. (Tr. 399).

151. After evaluating the SVTP, Belcher found it was definitely a learning environment, an educational environment. It was focused. Belcher testified that it was structured as a typical education program would be and it had measurable outcome to it. (Tr. 400–401). The Court finds that Belcher's testimony was not credible since it was based on only two days' observation, four hours each day.

*Gary Leon York*

152. In DX 12, as to the instances where "unknown" is shown under "Gain or Loss" are small projects. There is no record of any labor being paid because if it is made as a donation it goes direct to the church as a donation. (Tr. 426, 427).

153. #8 on DX 12 shows $40,000 received on the Ava Court construction. The church also received the land and the house it built. (Tr. 429).

154. Defendants introduced DX 1–8.

(The Findings of Fact are based only on the evidence which the Court found to be credible.)

### CONCLUSIONS OF LAW

The Statute, 29 U.S.C. § 203 in pertinent part includes the following definitions:

(d) "Employer" includes any person acting directly or indirectly in the interest of an employer in relation to an employee ...

(e)(1) ... the term "employee" means any individual employed by an employer.

. . . .

(g) "Employ" includes to suffer or permit to work.

The Defendants fit the definition of "Employer," based on all the Findings of Fact.

As to the minors under 16 years old, the definition of "employ" is satisfied by all the Findings of Fact including but not limited to FF 10, 11, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 70, 71, 72, 74, 75, 76, 79, 80, 81, 82, 83, 84, 85, 88, 90, 91, 92, 94, 95, 96, 97, 98, 99, 101, 102, 105, 106, 107, 108, 111, 112, 121, 124, 125, 126, 127, 131, 132, 133, 134, 135, 136, 138, 139, 140, 141, 143, 152, 153, and 154.

1. **Motivation and intention of Defendants and labels do not preclude creation of employment relationship under the statute.**

As the Supreme Court held in *United States v. Rosenwasser*, 323 U.S. 360, 362–363, 65 S.Ct. 295, 296–297, 89 L.Ed. 301 (1945):

The term "employee" is defined in § 3(e) to include "any individual employed by an employer," with certain exceptions not here pertinent being specified in § 13, and the term "employ" is defined in § 3(g) to include "to suffer or permit to work."

A broader or more comprehensive coverage of employees within the stated categories would be difficult to frame. The use of the words "each" and "any" to modify "employee," which in turn is defined to include "any" employed individual, leaves no doubt as to the Congressional intention to include *all* employees within the scope of the Act *unless specifically excluded*. (Emphasis added).

■ The use of labels by Defendants and Defendants' intent is meaningless, unless it mirrors the economic realities of the relationship. *Castillo v. Givens*, C.A.5 Tex.1983, 704 F.2d 181, *certiorari denied* 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147.

■ The economic reality test here is met in the case of the minors. (1) The minors here were suffered or permitted by the Defendants to work on building Defendants' houses or other projects which Defendants contracted for. (2) The minors were under the direction of Defendants' supervisors. (3) The hours minors worked were determined by Defendants or their supervisors. (4) The Defendants' tools and equipment were used by the minors. (5) The minors received none of the profits from their work. (6) The minors could not offer their services to others. (7) The Defendants and their supervisors kept close watch over minors' activities. (8) The minors are doing adults' work and displacing adult workers who could perform the same tasks. (9) Decisions as to what work is to be performed are made by Defendants and their supervisors. (10) "Imaginary" and actual pay raises are decided by Defendants. (11) Immediate benefits accrue to the Defendants in the sale of minors' work product. (12) If and when minors are paid is decided by Defendants. These are just a few of the economic realities which result from the Findings of Fact. See *McLaughlin v. McGee Bros. Co. Inc.*, 681 F.Supp. 1117 (W.D.N.C.1988).

In *McComb v. Homeworkers' Handicraft Cooperative,* 176 F.2d 633 (4th Cir.1949), in an opinion by Chief Judge Parker, the court stated on page 636:

> Whether or not the homeworkers are employees within the meaning of the Fair Labor Standards Act, however is to be determined, not by the common law concepts, but by a consideration of the purpose which Congress had in mind in the passage of the Act, which defines "employ" as including "to suffer or permit to work."

It is well established that the issue of whether an employment relationship exists under the FLSA must be judged by the "economic realties" of the individual case. *Weisel v. Singapore Joint Venture, Inc.,* 602 F.2d 1185, 1189 (5th Cir.1979). *That the appellants may not have had the intention to create an employment relationship is irrelevant;* "it is sufficient that one person suffer or permit another to work." *Brennan v. Partida,* 492 F.2d 707, 709 (5th Cir.1974).

*Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 470–71 (11th Cir.1982).

As this Court held in *McLaughlin v. McGee Bros. Co., Inc.,* 681 F.Supp. 1117, 1132 (1988):

> Simply because McGee has attempted to label the minors "trainees" and the Shiloh Vocational Training Program has paid their wages since October 5, 1987, when the totality of the circumstances is considered, does not give credence to Defendant McGee's contention that the words they use in designating these minors as "trainees" employed by Shiloh Vocational Training Program are what Defendant McGee choose those words to mean.

> The minors are clearly dependent on Defendants' business for their employment and are the class of person whom the Act is designed to protect. They are children doing adults' work, and regardless of the label Defendants have attached to them, *i.e.,* "trainees in Shiloh Vocational Training Program," they are manifestly being exploited by Defendants in this case whether or not they proclaim their purpose to be in furtherance of their religious beliefs.

The shenanigans Defendants have engaged in throughout this action with the help of their attorneys is a shameless effort to continue their exploitation of children in a commercial enterprise despite the laws of this country, which have been well settled for decades, that oppressive child labor is not to be tolerated.

If Defendants were allowed to prevail in their efforts to evade their statutory obligations not to employ oppressive child labor it would invite further mischievous schemes by other employers to avoid the burdens of a civilized society.

2. **Non-payment of minors under 16 years old who are "suffered or permitted to work" does not preclude their being determined to be employees.**

Another of the early cases in the Fourth Circuit was *Southern Ry. Co. v. Black,* 127 F.2d 280 (1942) in which the court decided that the red caps who worked at Southern Passenger Stations were employees of the railroad under the FLSA even though they were not compensated by the railroad.

Chief Judge Parker writing for the court at page 281 said:

> We agree with the Court below that on the undisputed facts the plaintiffs were employees of defendants within the meaning of the Fair Labor Standards Act, which defines "employ" as including "suffer or permit to work." Sec. 3(g), 29 U.S.C.A. Sec. 203(g). Services rendered by porters or red caps are absolutely necessary to the proper operation of the railway station such as that at Raleigh, N.C. and such persons are properly considered employees of the company on whose premises they work and to whose general supervision and direction they are subject, even though their compensation is derived from gratuities or tips received from persons to whom they render assistance. The determinative factor is not the source of their compensation, but the fact that they render services which are necessary to the proper running of the defendant's station, that they are hired or selected by defendants and permitted by them to render these services, that they are subject to the general super-

vision and control of defendants in rendering the services and that the defendants have the power to discharge them.

### 3. Defendant Shiloh as employer is the immediate and primary beneficiary of the minors' labor.

In *Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947), the Supreme Court held that:

[t]he definition "suffer or permit to work" was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantages on the premises of another. Otherwise, all students would be employees of the school or college they attended, and as such entitled to receive minimum wages. So also such a construction would sweep under the Act each person who, without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit ... [The definition of employee] cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction.

*Id.* at 152, 67 S.Ct. at 641. In applying this analysis, the Supreme Court held that workers in a railroad training program were working for their own benefit, not for the benefit of the employer railroad. Accordingly, those workers were not employees subject to the Act.

The facts in the case at bar are clearly distinguishable from *Walling v. Portland Terminal Co.*, 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1946) in which prospective railroad brakemen were given seven or eight days training without pay. The "training" in the case at bar was over a period of years, in some cases up to 6 years, and the minors under 16 years old were clearly displacing other prospective employees, since they were working with experienced employees and were working side by side with them—see for example, FF 51 through 58.

The courts have generally concluded that in determining who are "employees"

under the Act, common law employee categories or employer—employee classifications under other statutes are not of controlling significance since this Act contains its own definitions, comprehensive enough to require its application to many persons and working relationships which prior to this Act were not deemed to fall within the employer-employee category. *Real v. Driscoll Strawberry Associates, Inc.*, 603 F.2d 748 (9th Cir.1979).

In the Memorandum of Decision (document #63) granting the partial summary judgment motion this Court said:

In *McLaughlin v. Ensley*, 877 F.2d 1207 (4th Cir.1989) the Fourth Circuit clarified the *Portland Terminal* analysis. After looking at two prior Fourth Circuit cases which considered *Portland Terminal*— *Wirtz v. Wardlaw*, 339 F.2d 785 (4th Cir. 1947 [1964]) and *Isaacson v. Penn Community Services, Inc.*, 450 F.2d 1306 (4th Cir.1971)—the Court held:

[i]n sum, this court has concluded that the general test used to determine if an employee is entitled to the protections of the Act is whether the employee or the employer is the primary beneficiary of the trainees' labor.

*Ensley* at 1209. Further, after expressly disregarding the Wage and Hour Division's six part test to determine if a worker is an employee, the Court held "[there are] several facts that serve to illustrate the relative degrees of benefits. The most important of these relate directly to the nature of the training experience." *Id.* at 1209–10. The Court then held, after applying the primary beneficiary test, that the workers in the defendant's delivery training program were employees because "the skills learned were either so specific to the job or so general to be of practically no transferable usefulness." *Id.* at 1210.

In the case at bar, the Court finds the primary beneficiary test enunciated in *Ensley* is directly controlling. If the SVTP is the principal beneficiary of the under-sixteen children's labor, then they are employees. If, however, the under-sixteen children themselves are the princi-

pal beneficiaries of their labor, then they are not employees.

The Court has reviewed all the submissions by both parties and finds that there is a genuine dispute over whether the children or the Defendants primarily benefitted from the children's labor.

After reviewing the affidavits of the Defendant from Purser, Belcher, York, Little and McGee, all of whom were associated with the Defendants, and three of whom were witnesses for the Defendant at trial, the Court set out the evidence as it understood the affidavits and the competing inferences and made the following observation:

Thus the Court believes that the evidence gives rise to reasonable competing inferences on the issue of whether the SVTP or the children were the primary beneficiaries of the children's labor. Moreover, because determining who is the primary beneficiary is essential to determining whether the under-sixteen children are employees, summary judgment must be denied on this issue. Whether the under-sixteen children are employees is a question for trial.

After hearing the evidence, and based on the Findings of Fact, the Court concludes that Shiloh is the primary beneficiary of the work by the under-sixteen year olds, which is the sole issue in this case.

There were 97 construction projects built by Defendants utilizing the labor of minors under the age of 16 between May 1990 and July 1993. (FF 63, PX 64). Although the accounting records are incomplete, it is clear that the Defendants received in excess of $386,000.00 for only three houses at least partially built by minors under 16 years old. (FF. 60, 61, 62, 63, PX 64, pp. 2, 4). If the under-sixteen year olds did the work, Little, the supervisor-instructor, would inform the customer of the fair market value and the customer would be told that if he wanted to make a donation to the church it could be done, but he did not ask for a donation. (FF 24, 27). If the under-sixteen year old crew did the work, the customer was told he could write 2 checks, one for the material costs and one for the fair market value of the labor. (FF 25). The Shiloh administrator (York)

told Little to do that. (FF 26). Little was not aware of any job when the customer did not pay the fair market value. (FF 29). Obviously, this "donation" was a benefit to the church for what was essentially cost free labor. There was not any difference in the fair market value of a project based on whether the under- or over-sixteen year olds performed work. (FF 17).

In addition, the Defendants were able to have available labor which had been trained in some cases for six years at no cost (at least without payment of wages) by the Defendants. This was labor which had displaced adult workers in the marketplace during this "training" period. Thus, under the standard enunciated in *Ensley,* the Court finds that the under-sixteen year olds who were in the SVTP were employees of Shiloh.

### 4. Defendants have converted the SVTP into a commercial enterprise.

■ SVTP has seemingly converted what may, at one time, have been a vocational program, into a commercial enterprise involving hundreds of thousands of dollars. Admittedly the accounting for the program was sloppy. (FF 146).

However, FF 110, and PX 70 are to the effect that the masonry payroll on 10/28/87 as shown by the workmen's compensation policy, was $437,000.00. Tax-related documents as indicated by FF 110 and PX 29, reflect that the wages for the over-sixteen year olds and instructors for the year 1990 were $434,-985.13. This did not include pay for any under-sixteen year olds. (Some vocational program!) The Court is not aware in its experience of many volunteer church-related programs with an annual payroll of almost one-half million dollars, especially when a number of the employees are not paid anything.

Clearly, the program has been converted into a commercial enterprise competing with other contractors.

Finally, in *Brock v. Wendell's Woodwork, Inc.,* 867 F.2d 196, 198 (4th Cir.1989), the Fourth Circuit in affirming this Court's decision published in 685 F.Supp. 117 held:

There is nothing in the federal statutes, however, that prevents church members from arranging for some instruction of their children in vocational pursuits.

When the means adopted to serve that end consist of employing children in commercial enterprises that compete with other enterprises fully subject to the labor laws, however, the religious beliefs of the church members cannot immunize the employers from enforcement of the federal statutes. From the history of the industrial revolution in England and in this country, it is apparent that the United States has a substantial interest in regulating child labor, even to the point of prohibition. *See Prince v. Massachusetts,* 321 U.S. 158, 168, 64 S.Ct. 438, 443, 88 L.Ed. 645 (1944) (child employment particularly appropriate area for state to exercise broad authority). The sectarian purposes of the church members may be served by other means, but their service cannot be sought by putting children to productive work at power saw tables and on brick masons' scaffolding, in violation of the nation's labor laws. Were we confronted merely with violations involving older children or merely with excess hours in non-hazardous environments, this might have been a different case. In the case before us, however, the interest of the United States in prohibiting the employment of children in industrial environments must prevail.

Additionally, we may not ignore the interest of competing employers who comply with the relevant labor laws and feel the need to be free from competition with employers who do not comply.

It is no answer to this concern that the church members now concede that minimum wages should have been paid to the children. There is nothing to indicate that competing employers employ experienced adults at minimum entry level wages.

In short, the interest of the United States in the even-handed application and enforcement of its labor laws must prevail over the interest of church members who attempt to *transport a vocational training program into industrial and commercial environments* where children, save for

their ages, are indistinguishable from other employees. (Emphasis added).

█ Finally, the terms ... "employee" and "employer" are not to be construed in their common law senses when used in federal social welfare legislation (citing cases). Rather, their meaning is to be determined in light of the purposes of the legislation in which they are used ... *Mednick v. Albert Enterprises, Inc.,* 508 F.2d 297, 299 (5th Cir. 1975).

### CONCLUSION

Based on the Findings of Fact developed from the testimony and exhibits in this trial, the Court concludes that the under-sixteen year old children (some as young as 11 years old) working in the SVTP are employees under the current FLSA and the cases decided thereunder.

Any Finding of Fact which may be deemed a Conclusion of Law is so deemed, and any Conclusion of Law which may be deemed a Finding of Fact, is so deemed.

A final Judgment on the issue before the Court will be filed simultaneously with this Memorandum of Decision.

### *FINAL JUDGMENT*

In accordance with the Memorandum of Decision and Order filed simultaneously with this Judgment, the Court incorporates the partial summary judgment (document # 64), filed February 24, 1995, and in addition

**IT IS ORDERED, ADJUDGED AND DECREED:**

(1) The under-sixteen year olds who have been participating in the SVTP are employees of the Defendants in this action and have been and are employed in violation of the Fair Labor Standards Act, and the SVTP has employed oppressive child labor, failed to pay the minimum wage, failed to keep required records in violation of the FLSA.

(2) The Plaintiff shall recover from the Defendants back wages identified in Plaintiff's exhibit # 76 plus interest.

(3) The Defendants are enjoined from future violations of §§ 6, 11(c), and 12 of

the Fair Labor Standards Act (29 U.S.C. §§ 206, 211(c), and 212).

(4) Plaintiff shall have and recover its costs and expenses including such attorney's fees as may be approved by the Court based on affidavits filed by the Plaintiff.